## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 15 |
| Arctic Glacier International, Inc., | Case No. 12-10605 (KG) |
| Debtors in a Foreign Proceeding. | |

| | |
|---|---|
| Eldar Brodski Zardinovsky a/k/a Eldar Brodski a/k/a Eldar Brodski (Zardinovsky), EB Books, Inc., EB Design, Inc., EB Online, Inc., EB Imports, Inc., Lazdar Inc., Eldar Brodski Inc., Y Capital Advisors Inc., Valley West Realty Inc., Ruben Brodski, Ruben Brodski Inc., Ester Brodski, and Yehonathan Brodski, | |
| Plaintiffs, | Adv. Proc. No. 15-51732 (KG) |
| v. | |
| Arctic Glacier Income Fund, James E. Clark, Gary A. Filmon, David R. Swaine, and Hugh A. Adams, | |
| Defendants. | |

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT

Dated: March 14, 2016

Christopher P. Simon (No. 3697)
Kevin S. Mann (No. 4576)
CROSS & SIMON, LLC
1105 North Market Street, Suite 901
Wilmington, Delaware 19801
(302) 777-4200
csimon@crosslaw.com
kmann@crosslaw.com

David Gordon, Esquire
MITCHELL SILBERBERG & KNUPP LLP
12 East 49th Street, 30th Floor
New York, New York 10017-1028
(212) 509-3900
dbg@msk.com

# TABLE OF CONTENTS

**Pages**

PRELIMINARY STATEMENT .................................................................................... 1

STATEMENT OF FACTS ......................................................................................... 3

    A.    AGIF Disregards Applicable Securities Regulations
And Causes Chaos In The Marketplace .................................................. 3

    B.    The Brodski Parties Acquire FINRA Regulated AGIF
Units .................................................................................................. 6

    C.    AGIF Violates The Relevant SEC And FINRA
Regulations Relating To The Issuance Of Dividends ............................ 6

    D.    AGIF Admits That It Knew the Market Was
Misinformed and Did Nothing ........................................................... 10

ARGUMENT ....................................................................................................... 11

I.    THIRD CIRCUIT PRECEDENT PRECLUDES DEFENDANTS'
ERRONEOUS ARGUMENT THAT THE RECOGNITION
ORDER, PLAN AND/OR CANADIAN SANCTION ORDER
INSULATE THEM FROM CLAIMS ARISING AFTER THE
DATE OF THE RECOGNITION ORDER ...................................................... 11

    A.    Defendants Disregard The Language Of The Release And
Fail To Establish That It Is Enforceable Under Applicable
Law.................................................................................................... 12

    B.    Any Release And/Or Discharge On Which Defendants Rely
Is Unenforceable To The Extent That It Would Apply To
The Claims Of The Brodski Parties ..................................................... 13

II.    COUNT ONE OF THE COMPLAINT FOR NEGLIGENCE
STATES A CLAIM UPON WHICH RELIEF MAY BE
GRANTED............................................................................................. 17

III.    COUNT TWO OF THE COMPLAINT FOR NEGLIGENCE
STATES A CLAIM UPON WHICH RELIEF MAY BE GRANTED ........................ 19

    A.    Defendants' Duty Of Care Required Compliance With
FINRA Rules...................................................................................... 20

B.  Defendants Owed The Brodski Parties A Duty Of
    Care With Respect To The Establishment Of An
    Ex-Date.................................................................................................. 22

C.  Plaintiffs May Sue For Negligence Based On
    The Failure To Comply With Securities Regulations
    and Rules Relating To Establishment Of An Ex-Date........................... 24

IV.  COUNT THREE OF THE COMPLAINT FOR BREACH OF
     FIDUCIARY DUTY STATES A CLAIM UPON WHICH
     RELIEF MAY BE GRANTED .................................................................. 27

V.   COUNT FOUR OF THE COMPLAINT FOR NEGLIGENT
     MISREPRESENTATION STATES A CLAIM UPON
     WHICH RELIEF MAY BE GRANTED ..................................................... 29

     A.  The Brodski Parties Have Standing To Sue For
         Negligent Misrepresentation ................................................................. 29

     B.  The Brodski Parties Adequately Allege Material Omissions.................. 30

     C.  The Brodski Parties Adequately Allege Reasonable Reliance................ 34

VI   COUNTS FIVE AND SIX  OF THE COMPLAINT FOR
     VIOLATION OF SEC RULE 10B-5 AND AND COMMON
     LAW FRAUD STATE CLAIMS UPON WHICH RELIEF
     MAY BE GRANTED .............................................................................. 38

## CASES

*Adv. Multilevel Concepts, Inc. v. Bukstel*,
   919 F.Supp.2d 564 (E.D. Pa. Jan. 25, 2013) .................................................25

*Anger v. Berkshire Investment Group Inc.*,
   2001 CarswellOnt 329 (C.A.) at paras. 14-16................................................28

*As You Sow v. AIG Fin. Advisors, Inc*,
   584 F.Supp.2d 1034 (M.D. Tenn. 2008) ..........................................23, 24, 27

*Ayco Co., L.P. v. Feldman*,
   2010 U.S. Dist. LEXIS 112872 (N.D.N.Y Oct. 22, 2010).............................22

*Backman v. Polaroid Corp.*,
   910 F.2d 10 (1st Cir. 1990) .........................................................31, 33, 38, 39

*Bogart v. National Community Bank*,
   1992 U.S. Dist. Lexis 14958 (D.N.J. April 28, 1992).............................25, 30

*Cammer v. Bloom*,
   711 F.Supp. 1264 (D.N.J. 1989) ...................................................................35

*Chase Manhattan Bank v. Iridium Afr. Corp.*,
   197 F. Supp. 2d 120 (D. Del. 2002) ..............................................................31

*Craftmatic Sec. Litig. v. Kraftsow*,
   890 F.2d 628 (3d Cir. 1989).....................................................................31, 32

*Dobbie v. Arctic Glacier Income Fund*,
   2011 CarswellOnt 1301 (Ont. S.C.J.) ............................................................27

*Eisenberg v. Gagnon*,
   766 F.2d 770 (3d Cir. 1985)...........................................................................25

*Ernst & Ernst v. Hochfelder*,
   425 U.S. 185 (1976) ..................................................................................26, 27

*Finkel v. Docutel/Olivetti Corp.*,
   817 F.2d 356 (5th Cir. 1987)..........................................................................34

*Fischer & Porter v. Tolson*,
   1992 U.S. Dist. LEXIS 9169 (E.D. Pa. June 30, 1992) .................................26

*Gold v. Ford Motor Co*,
   937 F.Supp.2d 526 (D.Del. 2013), *aff'd*, 577 Fed. Appx. 120 (3d Cir. 2014)...........23, 39, 40

*Grossman v. Waste Mgmt, Inc.*,
   589 F.Supp. 395 (N.D. Ill. 1984) ...............................................................32

*Halpern v. Lightyear Network Solutions, Inc.*,
   2013 U.S. Dist. LEXIS 9654 (D. Nev. Jan 23, 2013) ...................................29

*Hayes v. Gross*,
   982 F.2d 104 (3d Cir. 1992) .......................................................................34

*Hoexter v. Simmons*,
   140 F.R.D. 416 (D. Ariz. 1991) ..................................................................35

*Holmes v. United Furniture Warehouse Ltd. Partnership*,
   2012 CarswellBC 1481 (C.A.) at paras. 17, 20 and 23 ................................28

*In re Adobe Systems, Inc. Sec. Litigation*,
   767 F. Supp. 1023(N.D. Ca. 1991) ..............................................................30

*In re Amatex*,
   755 F.2d 1034 (3d Cir. 1985) .....................................................................14

*In Re. Atlantic Fin. Fed. Sec. Litig.*,
   1990 U.S. Dist. Lexis 14807 (E.D. Pa. Oc. 31, 1990) ...........................25, 30

*In re Elpida Memory, Inc.*,
   2012 Bankr. LEXIS 5367 (Bankr. D. Del. Nov. 16, 2012) ..........................13

*In re mPhase Techs., Inc.*,
   Securities Exchange Act Release No. 74187 (Feb. 2, 2015)...................22, 37

*In re Positron Corp*,
   Securities Exchange Act Release No. 74216 (Feb. 5, 2015)...............22, 37, 38

*In re Quintel Entertainment Inc. Sec. Litig.*,
   72 F.Supp. 2d 283 (S.D.N.Y. 1999) .....................................................31, 33, 39

*In Re Sivec SRL*,
   476 B.R. 310 (Bankr. E.D. Okl. 2012) .........................................................13

*In re Worlds of Wonder Sec. Litig.*,
   721 F. Supp. 1140 (N.D. Ca. 1989) .............................................................30

*In Van DeMoolen Holding N.V, Sec. Litig.*,
   405 F.Supp.2d 388 (S.D.N.Y. 2005) ...........................................................32

*Interpool, Ltd. v. Certain Freights of M/V Star*,
   102 B.R. 373 (D. N.J. 1988).......................................................................13

*Javitch v. First Montauk Fin. Corp.*,
    279 F. Supp. 2d 931 (N.D. Ohio 2003) ................................................................22, 24, 27

*Jones v. Chemetron Corp.*,
    212 F.3d 199 (3d Cir. 2000) .............................................................................1, 13, 14, 15

*Karathansis v. THCR/LP Corp.*,
    2007 WL 1234975 (D.N.J. April 25, 2007),
    *aff'd*, 298 Fed. Appx. 120 (3d Cir. 2008) ...................................18, 19, 20, 21, 22

*Krongman v. Sterritt*,
    202 F.R.D. 467 (N.D. Tex. 2001) ....................................................................................35

*Lawrence v. Atlas Cold Storage Holdings Inc.*,
    2006 CarswellOnt 5716 (S.C.J.), addt'l reasons at 2007 CarswellOnt 479 (S.C.J.).............28

*Mihara v. Dean Wittier& Co.*,
    619 F.2d 814 (9th Cir. 1980)..........................................................................23, 24, 27

*Morgan Olson L.L.C. v. Frederico*,
    467 B.R. 694 (S.D.N.Y. 2012) .......................................................................................15

*Public Pension Fund Group v. KV Pharm. Co.*,
    679 F.3d 972 (8th Cir. 2012) ..........................................................................................32

*Scott v. Dime Sav. Bank*,
    886 F. Supp. 1073 (S.D.N.Y. 1995) .........................................................................23, 24, 27

*Seidman v. American Mobile Sys., Inc.*,
    813 F. Supp. 323 (E.D. Pa. 1993) ..................................................................................34

*Shapiro v. UJB Fin. Corp.*,
    964 F.2d 272 (3d Cir. 1992)............................................................................................30

*Shields v. Newbridge Secs., Inc.*,
    1992 Bankr. LEXIS 1706 (Bankr. E.D. Pa. Oct. 29, 1992) .......................................22, 24, 27

*White v. Chance Indus. (In re Chance Indus.)*,
    367 B.R. 689 (Bankr. D. Ka. 2006)..............................................................................15

*Winer Family Trust v. Queen*,
    2004 U.S. Dist. LEXIS 19244 (E.D. Pa. Sept. 27, 2004)................................................34, 35

## STATUTES

11 U.S.C. § 1109(b) ..........................................................................................................14

11 U.S.C. § 1141(d)(1)(A) ................................................................................................14

## OTHER AUTHORITIES

FINRA Notice to Members 00-54.................................................................................9, 10, 11

FINRA Rule 6490 ..................................................................7, 8, 10, 11, 20, 21, 22

FINRA Rule 11100 .....................................................................................................22

FINRA UPC 11140 ................................................................9,10, 11, 18, 21, 32, 33, 36

SEC Release No. 34-62434 (July 1, 2010).........................................7, 20, 21, 22, 23

SEC Rule 10b-17.......................................................6, 7, 8, 9, 10, 11, 20, 23, 24, 25, 26, 40

SEC Rule 10b-5.................................................................................24, 26, 37, 40

1.      Plaintiffs (collectively, the "Brodski Parties") respectfully submit this Memorandum of Law in opposition to Defendants' Motion to Dismiss the Complaint.

## PRELIMINARY STATEMENT

2.      This case concerns Defendants' brazen disregard of the entire, detailed U.S. regulatory scheme relating to the payment of dividends.  In so doing, Defendants have trampled on the legal rights of, and caused significant damages to, the Brodski Parties.

3.      Now, through their motion to dismiss, Defendants continue to demonstrate their lack of respect for the U.S. legal system.  Their motion fatally ignores Third Circuit rulings and blatantly mischaracterizes case law and their own prior statements.

4.      Although Defendants acknowledge that Plaintiffs' claims all arose after the date of the release on which they rely, they fail to disclose that (a) the release is effective, by its terms, only to the extent allowed by law and (b) under *Jones v. Chemetron Corp*., 212 F.3d 199 (3d Cir. 2000), enforcement of the release against the Brodski Parties, whose interests were not represented in the underlying bankruptcy proceeding, would violate the Due Process Clause of the U.S. Constitution.  Defendants address neither of these critical points.

5.      Count One of the Complaint asserts that Defendants were negligent because they had a duty, under FINRA rules, to pay dividends to Plaintiffs, and Defendants breached that duty.  In seeking dismissal of this claim, Defendants argue that the relevant Plan of Arrangement ("Plan") conflicted with FINRA rules and the terms of the Plan trump FINRA rules.  Defendants are wrong on both points.  Nothing in the Plan precluded compliance with FINRA rules.  Further, under a decision affirmed by the Third Circuit, if there was a conflict, Defendants were obligated to pay unitholders entitled to be paid ***under either the Plan or FINRA rules***.

6.      Defendants seek dismissal of Count Two, which asserts that Defendants acted negligently by setting a date on which Arctic Glacier Income Fund ("AGIF") units could no longer be acquired with the right to receive a dividend  (the "ex-date") without FINRA approval, principally on the ground that AGIF, as a company traded on the U.S. Over the Counter ("OTC") market, owed Plaintiffs no duty under FINRA rules.  However,  based on a decision of the SEC, FINRA rules, and a ruling of the Third Circuit, AGIF was bound by FINRA requirements, and there are numerous cases holding that plaintiffs may sue for negligence based on violations of FINRA rules.

7.      The argument of the individual Defendants that Plaintiffs cannot sue them for breach of fiduciary duty, pursuant to Count Three of the Complaint, because they did not owe AGIF unitholders fiduciary duties under Canadian law is meritless.  These individual Defendants already have made and lost this argument in Canada.

8.      Defendants seek dismissal of Count Four of the Complaint, for negligent misrepresentation, arguing that Plaintiffs lack standing to assert the claim, have not adequately alleged material omissions of fact, and have not adequately alleged reasonable reliance on such omissions by Plaintiffs.  However, Plaintiffs have: (a) standing as AGIF unitholders; (b) alleged that Defendants knew, but elected not to disclose, that they had decided to disregard the U.S. regulatory scheme and, further, failed to make required corrective disclosures when they specifically observed and noted that the entire U.S. market had not understood their misleading disclosures; and (c) properly alleged reliance based on the fraud on the market theory.

9.      Defendants seek dismissal of Counts Five and Six of the Complaint, for common law and federal securities fraud, on the ground that Plaintiffs supposedly have not alleged *scienter*. However, Defendants acknowledge that *scienter* can be established by showing reckless misconduct, and the Complaint alleges, *inter alia*, that Defendants acted recklessly when they

refused to make a corrective disclosure after noting that the entire U.S. market could not have understood, based on the lack of any reaction to their announcement, that Defendants intended to disregard FINRA rules and not pay dividends to purchasers of AGIF units after December 15, 2014.

## STATEMENT OF FACTS[1]

10.    The Plan authorized AGIF to make distributions to its unitholders. Complaint ("Cmplt.") ¶ 28.  It established a general procedure for paying dividends, but omitted details that only could be set by regulators, including the date on which an investor had to own AGIF units to have the right to receive the dividend, and the dividend payment date and amount.  *Id.*

A.    **AGIF Disregards Applicable Securities Regulations And Causes Chaos In The Marketplace**

11.    On December 15, 2014, AGIF issued a press release entitled "Arctic Glacier Income Fund Announces Unitholder Distribution Record Date" (the "Press Release") stating:

. . .unitholders of the Fund as of December 18, 2014 will be entitled to receive the initial distribution from the Fund pursuant to the Plan of Compromise or Arrangement of, *inter alia*, the Fund dated May 21, 2014, as amended on August 26, 2014, and approved by the unitholders

Cmplt. ¶ 31.[2]  Despite its units trading in the U.S. market, AGIF did not communicate to FINRA, the applicable securities regulator in the United States, its intention to make a dividend payment. *Id.*  AGIF did not have a website where the Press Release could be posted.  *Id.*

12.    The Press Release only announced a purported record date. Cmplt. ¶ 33.  It did not announce the "ex-date," the date on which a security begins to trade "excluding," or without the right to receive, a dividend.  *Id.*  As explained further below, there is a fundamental and significant difference between the ex-date and the record date. *Id.*

---

[1] Copies of materials, other than U.S. cases, cited below are attached to the accompanying Declaration of Kevin Mann, except for any such materials submitted by Defendants.
[2] The other purported December 2015 "legal notices" and press releases noted in Defendants' Opening Brief ("Op. Br.") contained either substantially the same or less information.

13.     Critically, AGIF lacked the authority to set the ex-date that determines which unitholders are entitled to dividends.  FINRA UPC 11140.  As explained below, only FINRA has the authority to determine such date.  *Id.*  Limiting authority to FINRA makes the regulator's websites and publications the only official source of reliable information relating to dividend payments for OTC securities, thus preventing investor confusion from companies posting information about dividends without the required approvals. Cmplt. ¶ 34.

14.     If FINRA elects to process an issuer's request to pay a dividend, FINRA will announce the action on the "Daily List," which is the only official announcement of this dividend to the OTC market.  Cmplt. ¶ 37.

15.     Despite the Press Release, the price of AGIF units did not materially change until the date of the dividend payment, confirming that buyers of AGIF units continued to believe that they would receive any dividend that AGIF previously announced it would pay. Cmplt. ¶ 38.  Indeed, buyers had every right to hold that belief, as no securities regulator had determined and announced the ex-date for AGIF units, as was required under securities regulations. *Id.*

16.     On January 21, 2015, AGIF issued a press release, which FINRA did not receive or approve, that dividends would be paid within five days of January 22, 2015.  Cmplt. ¶ 39.

17.     Beginning on January 22, 2015, AGIF paid a dividend of $0.15557 USD per unit.  Cmplt. ¶ 40.  According to AGIF, AGIF made these payments to the unitholders of AGIF as of December 18, 2014 who had purchased units by December 15, 2014.  *Id.*  The dividend was more than 75% of the total value of the unit price – $0.20 – on the date of payment.  *Id.*

18.     The relevant securities regulators did not approve or authorize the December 16, 2014 ex-date that AGIF unilaterally and unlawfully imposed as a consequence of its decision to pay unitholders who had purchased units by December 15, 2014.  Cmplt. ¶ 41.

19.    AGIF's disregard of securities regulations created chaos in the market.  Cmplt. ¶ 43.  FINRA halted trading of the units in the United States from January 23, 2015 to January 28, 2015.  Cmplt. ¶ 44. In the days immediately after FINRA allowed trading of AGIF units to resume, the average unit price dove 75% to USD $0.05 from its closing price of approximately USD $0.21 on January 22, 2015, the Plan Implementation Date.  Cmplt. ¶ 45. The massive drop in the price of AGIF units more than one month after the issuance of the Press Release confirmed that buyers of AGIF units after the Press Release's issuance were unaware that AGIF had purported, by itself, to set an ex-date and that AGIF would not distribute to them. *Id.*

20.    On December 15, 2014, the last date on which an investor could acquire AGIF units and still receive the dividend payment based on AGIF's self-declared and undisclosed ex-date, the market price per unit was $0.20.  Cmplt. ¶ 46. However, the price of the units remained **materially unchanged on December 16, 2015, and remained that way for the subsequent five weeks**. *Id.*  The AGIF unit price on December 15, 2014 closed at $0.20 and the price on December 16, 2014 closed at $0.205.  *Id.* Nearly 26 million units then traded near $0.20 per unit through and including January 22, 2015. *Id.*  Thus, an investor who purchased units of AGIF on December 15, 2014 for $0.20 received a dividend of approximately $0.155 from AGIF, while an investor who purchased an AGIF unit on December 16, 2015 for $0.20 received nothing from AGIF.  Cmplt. ¶ 47. The absurdity of these results – investors paying exactly the same unit price one day apart but receiving dramatically different returns – confirms that investors were in the dark regarding AGIF's intention to disregard the authority of securities regulators to set the ex-date and announce its own ex-date in violation of relevant rules and regulations. Cmplt. ¶ 48.

**B.**    **The Brodski Parties Acquire FINRA Regulated AGIF Units**

21.    Plaintiffs acquired 12,641,050 units of AGIF from December 16, 2014 to January 22, 2015, through U.S. brokers on the U.S.-based OTC market. Cmplt. ¶¶ 50, 55.

22.    Plaintiffs purchased their units of AGIF at prices ranging from USD $0.18 to approximately $0.22.  Cmplt. ¶ 51. The AGIF unit price reflected investors', including the Brodski Parties', justifiable beliefs that the units continued to trade with the right to receive the dividend between and including December 16, 2014 and January 22, 2015 and that AGIF would adhere to the applicable securities rules and regulations. Cmplt ¶ 52.  The Brodski Parties thus purchased their AGIF units with the expectation that they would receive the substantial dividends ultimately paid by AGIF.  *Id.*

**C.**    **AGIF Violates The Relevant SEC And FINRA Regulations Relating To The Issuance Of Dividends**

23.    SEC Rule 10b-17 establishes a mandatory set of disclosures that an issuer of securities that are traded on the OTC must make if it wishes to pay a dividend.  The purpose of SEC Rule 10b-17 is to protect investors from fraud, and it states in pertinent part:

It shall constitute a "manipulative or deceptive device or contrivance" . . . for any issuer of a class of securities publicly traded by the use of any means or instrumentality of interstate commerce or of the mails or of any facility of any national securities exchange to fail to give notice in accordance with paragraph (b) of this section of the following actions relating to such class of securities . . . (1) A dividend or other distribution in cash . . .

24.    SEC Rule 10b-17(b) establishes a deadline by which any issuer desiring to pay dividends must notify FINRA.  It states that, subject to certain exceptions not applicable here, "Notice shall be deemed to have been given in accordance with this section **only if**: (1) Given to [FINRA], no later than 10 days prior to the record date involved  . . ."  (emphasis added).

25.     SEC Rule 10b-17 does not exempt foreign issuers from its disclosure obligations. It expressly applies to any issuer that has "a class of securities publicly traded by the use of any means or instrumentality of interstate commerce or of the mails," wherever the issuer's location.

26.     The SEC, through SEC Release No. 34-62434 (July 1, 2010) (the "SEC Release"), specifically granted to FINRA the power to regulate the payment of dividends by companies traded on the OTC, including, without limitation, the power to refuse an OTC company's request to pay dividends because of the failure to provide the information specified in SEC Rule 10b-17 to FINRA.   As confirmed in the SEC Release, Rule 10b-17 is applicable to all issuers of securities that trade through the OTC market.

27.     The SEC Release explained that FINRA Rule 6490 ("Rule 6490"), which the SEC approved on September 27, 2010, established procedures within FINRA for the review and determination of requests to issue, *inter alia*, dividends, as well as for the submission of the necessary documentation for an issuer to comply with SEC Rule 10b-17.  The SEC Release further explained that Rule 6490 was designed to protect "the OTC marketplace and investors in OTC Securities" by permitting FINRA to deny a Company-Related Action request when there are "certain indicators of potential fraud" or the potential for investor harm exists.

28.     FINRA Rule 6490 states in pertinent part:

**(a) General**

(1) In furtherance of FINRA's obligations to foster cooperation and coordination of the clearing, settling and processing of transactions in equity and debt securities of any issuer with a class of publicly traded, non-exchange listed, securities in the OTC market and, in general, to protect investors and the public interest**,** FINRA's Operations Department ("Department") reviews and processes documents related to announcements for SEA Rule 10b-17 Actions . . .

(2) For purposes of this Rule, the term "SEA Rule 10b-17 Actions" includes dividends . . . and such other actions as are provided for in SEA Rule 10b-17. . . .

Thus, Rule 6490 applies to payment of dividends by **any** OTC issuer.[3]

29.     Rule 6490(3) makes clear that the payment of dividends by companies traded on the OTC market, without FINRA's approval, is impermissible:

In circumstances where an SEA Rule 10b-17 Action or Other Company-Related Action is deemed deficient, the Department may determine that it is necessary for the protection of investors, the public interest and to maintain fair and orderly markets, that documentation related to such SEA Rule 10b-17 Action or Other Company-Related Action will not be processed.

30.     To ensure that investors receive the information specified in SEC Rule 10b-17, FINRA publishes the "Daily List" of announcements regarding dividends.  Thus, if an issuer is complying with its obligations under SEC Rule 10b-17 and FINRA rules, investors can monitor FINRA's website to obtain reliable information regarding payments of dividends.  Cmplt. ¶ 67. Investors have the absolute right to conclude, based on Rule 6490, that until FINRA has announced the amount and date of a dividend payment, no determination as to these matters has been made and the security continues to trade with the right to receive a dividend.  Cmplt.¶ 68.

31.     Once AGIF decided to pay dividends, it was required by SEC Rule 10b-17 and Rule 6490 to notify FINRA of the decision 10 days prior to the record date, which in this case would have been December 8, 2014, further advise FINRA of, *inter alia*, the date and amount of the dividend payment, and obtain FINRA's approval.  Cmplt. ¶ 69.  Without any apparent excuse, AGIF paid a dividend on or about January 22, 2105 even though FINRA had not been given the requisite notice and information, approved the payment or established an ex-date.  *Id.*

32.     FINRA has also adopted UPC 11140 and issued a notice that specifies (1) that, with respect to OTC companies, FINRA has the authority to designate the ex-date, and (2) the rules that must be used to set the ex-date.  UPC 11140(a) and (b)(2) state in pertinent part:

(a)     **Designation of Ex-Date**

---

[3] This includes foreign exchange listed companies.  Rule 6490 (Supplementary Materials: .02).

All transactions in securities, except "cash" transactions, shall be "ex-dividend . . .": (1) on the day specifically designated by the Committee after definitive information concerning the declaration and payment of a dividend . . . has been received at the office of the Committee; or (2) on the day specified as such by the appropriate national securities exchange which has received definitive information in accordance with the provisions of SEA Rule 10b-17 concerning the declaration and payment of a dividend . . .

(b)    **Normal Ex-Dividend, Ex-Warrants Dates**

(2) In respect to cash dividends or distributions . . . which are 25% or greater of the value of the subject security, the ex-dividend date shall be the first business day following the payable date.

Thus, under UPC 11140(a), when a security trades on the OTC, it is FINRA, and not the OTC issuer – *i.e.* AGIF – that determines the ex-date.

33.     FINRA Notice to Members 00-54 explains that the ex-date is determined solely by the date of payment of the dividend when the dividend exceeds 25% of the security's price:

[S]ubparagraph (b)(2) of Rule 11140, provides that for dividends or distributions that are 25 percent or greater of the value of the subject security, the ex-date shall be the first business day following the payable date. For example, if an issuer has announced August 10 as the record date and August 31 as the payable date, then the ex-date will be September 1, the first business day after the payable date. In this example, September 1 is the day on or after which a buyer would purchase the security without the dividend and, therefore, the day on which the price of the stock is adjusted downward.

Therefore, pursuant to FINRA UPC 11140(b)(2) and Notice to Members 00-54, when 25% or more of the value of a security is paid as a dividend, **the holders of the security as of the close of trading on the date of payment**, or the day before the ex-date established by FINRA pursuant to UPC 11140(a), are entitled to receive the dividend.

34.     Thus, AGIF's dividend, which was over 25% of the value of its securities, should have been paid to unitholders as of the close of trading on the date of payment.  Cmplt.¶ 74. The December 18, 2014 date, which AGIF announced without any authority or the requisite FINRA approval as the purported "record date" for the payment of dividends, was irrelevant for

purposes of determining the "ex-date" pursuant to FINRA UPC 11140(b)(2), because the value of the dividend was approximately 75% of the value of the AGIF share price.  *Id.*

35.    In short, if a company paying 25% or more of the value of a security as a dividend notifies FINRA of its decision, as required by SEC Rule 10b-17, and obtains FINRA's approval, as required by FINRA Rule 6490, investors will know, by monitoring FINRA's website, that, pursuant to UPC 11140(b)(2) and Notice to Members 00-54, they will receive the dividend payment if they hold units on the date payment is to be made. Cmplt.¶ 75.

36.    Because the amount of the dividend paid by AGIF was approximately 75% of the value of the outstanding securities of AGIF, FINRA UPC 11140(b)(2) and Notice to Members 00-54 required AGIF to pay the dividends to the holders of its units as of the close of trading on the date of payment, approximately January 22, 2015.  Cmplt.¶ 76.  AGIF disregarded UPC 11140(b)(2) and Notice to Members 00-54.  *Id.*

**D.    AGIF Admits That It Knew the Market Was Misinformed and Did Nothing**

37.    On or about March 5, 2015, Plaintiff Eldar Brodski Zardinovsky ("Eldar") spoke by telephone with Defendant Adams, AGIF's Secretary, regarding AGIF's failure to pay the required dividends to Plaintiffs.  Cmplt.¶ 77.  Adams admitted that he had observed after the issuance of the Press Release that there was no change in the market price of AGIF units, despite AGIF's assertion that it had set December 16, 2014 as the ex-date, which Adams admitted should have caused the share price to have fallen by 75% on December 16, 2014, the first day units supposedly began to trade without the right to receive the dividend. *Id*.

38.    Adams further informed Eldar that despite this awareness that AGIF units were trading at an unjustified several hundred percent premium, Defendants affirmatively decided not

to take any corrective action.  Cmplt.¶ 78.  As a result, Plaintiffs and other purchasers of AGIF

units between December 16, 2014 and January 22, 2015 incurred a 75% loss.  Cmplt.¶ 80.

39.     Despite the fact that AGIF was subject to SEC and FINRA rules and regulations,

and thus was required to adhere to SEC Rule 10b-17, Rule 6490, UPC 11140(a) and (b)(2) and

Notice to Members 00-54 in connection with the disclosure and payment of dividends to

unitholders, AGIF failed to notify either the Canadian or Delaware bankruptcy court of the

contents of these rules and regulations and its duty to comply with them.  Cmplt.¶ 83.

## ARGUMENT

**I.     THIRD CIRCUIT PRECEDENT PRECLUDES DEFENDANTS' ERRONEOUS
ARGUMENT THAT THE RECOGNITION ORDER, PLAN AND/OR
CANADIAN SANCTION ORDER INSULATE THEM FROM CLAIMS ARISING
AFTER THE DATE OF THE RECOGNITION ORDER**

40.     Defendants argue that the Order Recognizing and Enforcing Order of Canadian

Court Sanctioning and Approving CCAA Plan (the "Recognition Order"), the Sanction Order

entered by the Court of Queen's Bench Winnipeg Centre ("Sanction Order") and/or Plan bar

any claim based on payments of dividends to AGIF unitholders.  Specifically, they maintain that

these documents contained releases and other language that exempted them from liability for

any conduct that occurred *after* such documents were signed or entered, including conduct

relating to the payment of distributions that had not yet occurred.

41.     This argument is flawed in two key respects.  First, the Recognition Order

explicitly states that any release applies only to claims that can be released under applicable

law.  Defendants cite no authority holding that Plaintiffs' claims could have been lawfully

extinguished by the Recognition Order (or Plan or Canadian Sanction Order).  Second, pursuant

to the Due Process Clause of the U.S. Constitution, as recognized by the Third Circuit (and

other courts), releases and/or discharges of claims in bankruptcy are unenforceable where, as

here, the claim arose after the date of the discharge or release and the plaintiffs' interests were

not represented in the underlying bankruptcy proceeding.  The Recognition Order, Canadian

Sanction Order and Plan are unenforceable insofar as they violate the Due Process Clause.

> A.    Defendants Disregard The Language Of The Release And Fail To
> Establish That It Is Enforceable Under Applicable Law

42.    Defendants primarily rely on the release language contained in paragraph 5 of

the Recognition Order to argue that a release bars the claims brought by the Brodski Parties.

Specifically, they maintain that the Recognition Order, which was dated September 16, 2014,

extinguished, *inter alia*, claims that arose between September 16, 2014 and January 2015.

43.    However, Defendants' Brief omits an express limit on the scope of the release set

forth in the Recognition Order.  Section 5 of the Recognition Order states that is effective only

"to the full extent permitted by applicable law."  Thus, the Recognition Order does not grant a

release to the extent that doing so would be impermissible under applicable law.

44.    Defendants do not even argue, let alone cite any case holding, that the release in

the Recognition Order could have lawfully extended to claims, like Plaintiffs', that had not

arisen (and could not have been contemplated) as of the date of the Recognition Order.

Defendants do not identify any connection between Plaintiffs and Defendants on or before the

date of the Recognition Order.  Indeed, there was no such relationship until ***after*** the date of the

Recognition Order.   Cmplt. ¶ 50.  As Defendants have not established that the release on which

they rely lawfully extended to Plaintiffs' claims, their argument for dismissal fails.

45.    Defendants' reliance on release language contained in the Plan and Canadian

Sanction Order is similarly misplaced.  Defendants do not cite any authority establishing that a

release contained in a plan of reorganization and/or approved by a Canadian court can bar a

claim brought by a U.S. citizen in a U.S. court, to the extent that enforcement of the release

would be contrary to U.S. law (*i.e.*, the Due Process Clause).  Indeed, any such argument would be meritless in view of the fact that this Court specifically declined to allow the release granted in the Recognition Order to apply to claims that could not be released under applicable law.[4]

> B.    Any Release And/Or Discharge On Which Defendants Rely Is Unenforceable To The Extent That It Would Apply To The Claims Of The Brodski Parties

46.    Based on Third Circuit precedent, any release or discharge granted to Defendants would be unenforceable as a matter of law, insofar as it relates to the Brodski Parties.  The interests of the Brodski Parties were not, directly or through others acting for them, represented during any of the relevant bankruptcy proceedings.

47.    The Third Circuit has held that a discharge in bankruptcy is ineffective to bar a claim that arose post-discharge if the bankruptcy proceeding did not specifically address the interests and potential claims of future claimants.  *Jones v. Chemetron Corp.*, 212 F.3d 199 (3d Cir. 2000).  The Third Circuit held that the Due Process Clause of the U.S. Constitution precludes a discharge in bankruptcy in these circumstances.  *Id.* at 209-210.

48.    In *Chemetron*, a plaintiff who was not yet born as of the date of a discharge in bankruptcy asserted personal injury claims based on his mother's exposure to toxic chemicals. Noting that the interests of future claimants had not been represented in the bankruptcy proceeding, the Third Circuit ruled that the plaintiff could pursue his personal injury claims despite the discharge received by the debtor.  The Third Circuit explained as follows:

---

[4] This was consistent with holdings that comity should be granted to foreign decisions only if the foreign court "provided the same fundamental protections that litigants in the United States would receive." *In re Elpida Memory, Inc.*, 2012 Bankr. LEXIS 5367, at *11 (Bankr. D. Del. Nov. 16, 2012); *accord In Re Sivec SRL,* 476 B.R. 310, 320 (Bankr. E.D. Okl. 2012)("Comity is only to be extended so long as the interests of U.S. creditors are sufficiently protected, and so long as any actions taken are not manifestly contrary to the public policy of the United States"); *Interpool, Ltd. v. Certain Freights of M/V Star,* 102 B.R. 373, 378 (D. N.J. 1988)("Actions taken by a foreign court in a foreign bankruptcy are to be given deference if, and only if, there would be no substantial violation of the law that would be applied in the United States").

Under Chapter 11 of the Bankruptcy Code, "the confirmation of a plan . . . discharges the debtor from any debt that arose before the date of such confirmation." 11 U.S.C. § 1141(d)(1)(A). Thus, in most circumstances, "confirmation of the debtor's reorganization plan discharges all prior claims against the debtor." However, if a potential claimant lacks sufficient notice of a bankruptcy proceeding, due process considerations dictate that his or her claim cannot be discharged by a confirmation order. Such due process considerations are often addressed by the appointment of a representative to receive notice for and represent the interests of a group of unknown creditors. In *In re Amatex*, 755 F.2d 1034 (3d Cir. 1985), this court held that a representative could be appointed to represent the interests of future unknown asbestos claimants in bankruptcy reorganization proceedings because such claimants are "sufficiently affected by the reorganization proceedings" as to require some voice in them and therefore qualify as "parties in interest" under 11 U.S.C. § 1109(b). The *Amatex* court did not decide whether future claimants are "creditors" who possess "claims" that may be discharged by a bankruptcy confirmation order. We need not reach this issue, however, because in the instant case there exists a more fundamental problem. Ivan Schaffer cannot be deemed to have received adequate notice of Chemetron's Chapter 11 bankruptcy proceeding, because no effort was made to address his potential claims in that proceeding.

Where no action is taken to address the interests of unborn future claimants in a Chapter 11 bankruptcy reorganization proceeding, the reorganized former debtor cannot later avoid liability to such claimants by arguing that their claims were discharged in bankruptcy. Under fundamental notions of procedural due process, a claimant who has no appropriate notice of a bankruptcy reorganization cannot have his claim extinguished in a settlement pursuant thereto. Here, Ivan Schaffer had no notice of or participation in the Chemetron reorganization plan. No effort was made during the course of the bankruptcy proceeding to have a representative appointed to receive notice for and represent the interests of future claimants. Therefore, whatever claim Ivan Schaffer may now have was not subject to the bankruptcy court's bar date order and was  not discharged by that court's confirmation order.

> *        *        *        *        *        *

Accordingly, we hold that the potential claim of an unborn child not represented in bankruptcy reorganization proceedings is not discharged by a confirmation order.

*Chemetron*, 212 F.3d at 209-210 (internal citations and quotation marks omitted).  The

*Chemetron* court also noted that the plaintiff had not been represented at the underlying

bankruptcy even though his mother had received notice of the bankruptcy.  *Id.* at 210.[5]

---

[5] *Accord Morgan Olson L.L.C. v. Frederico*, 467 B.R. 694 (S.D.N.Y. 2012)(". . . there was not a future claims representative in this case, or any provisions made for unrepresented future claimants. Thus, the Fredericos (and other future claimants in their position) were not afforded either the notice and opportunity to participate in the proceedings or representation in the proceedings that due process would require in order for them to be bound by the Bankruptcy

49.     Based on these authorities, Defendants' argument for dismissal of Plaintiffs' claims based on the releases and bankruptcy discharges set forth in the Recognition Order, Canadian Sanction Order and Plan plainly fails.  There is no evidence that Plaintiffs had any contact with AGIF on or before the date of the Recognition Order (or the earlier dates of the Canadian Sanction Order and Plan).  In reality, because Plaintiffs did not even begin to acquire the relevant AGIF units until December 16, 2015 (Cmplt ¶ 50), three months after entry of the Recognition Order, the Brodski Parties *could not have had any claims* until after entry of the Recognition Order.  Further, the record is devoid of  proof that the Canadian court appointed anyone to represent the interests of claimants in the position of Plaintiffs.  Under circumstances such as these, a debtor and related parties cannot later avoid liability based on a discharge or releases obtained in bankruptcy.  That would violate fundamental notions of due process.

50.     Defendants' Opening Brief addresses none of these issues.  Defendants utterly fail to address the due process limitations on the enforceability of the Recognition Order, Canadian Sanction Order, and Plan and the fact that the Recognition Order, as stated above, releases claims only to the extent permissible under applicable law.  Put differently, Defendants ignore Third Circuit and other authority that limit the enforceability of bankruptcy discharges and releases with respect to claims based on post-Recognition Order events.[6]

---

Court's orders"); *White v. Chance Indus. (In re Chance Indus.)*, 367 B.R. 689 (Bankr. D. Ka. 2006)(holding that a party's post-confirmation state court product liability action was not discharged by a confirmation order on due process grounds because "No future claims fund or trust was established under the plan to fund products liability claims arising in the future;" "No future claims representative was provided for in the plan to represent the interests of unknown future claimants;" and "No notice was given to a future claims representative.")

[6] Not one of the cases that Defendants cite, in paragraph 31 of the Op. Br., for the proposition that the Recognition Order and Canadian Sanction Order are final and binding addresses the due process limitations recognized in *Chemetron* and other cases.

51.     Defendants' reliance on the portion of the Recognition Order that stated that AGIF shall not "incur any liability as a result of acting in accordance with the terms of the Plan and this Sanction Recognition Order" is baseless.  Preliminarily, the Brodski Parties do not seek to hold Defendants liable because of any acts *in accordance with* the Plan and Recognition Order.  Rather, as explained further below, liability is predicated on Defendants' disregard of its concurrent and additional obligations under U.S. law that did not conflict in any respect with the Plan or Recognition Order.  Moreover, as explained above, the Third Circuit recognizes that there are constitutional limitations that preclude insulating a debtor from liability where the claimant's interests were not represented during bankruptcy.  Also, the part of the Recognition Order in question provides no protection to the individual Defendants.

52.     To the extent that Defendants reference the Unitholder Claims Procedure Order, it is unclear how that is of any help to them.  This Order of the Canadian court does not purport to eliminate the claims of the Brodski Parties.  And, even if it attempted to do so, this Court recognized the Unitholder Claims Procedure Order only to the extent it does not interfere with the Brodski Parties' ability to pursue their claims in this Court.  Docket No. 427, ¶¶ 1,3.

53.     Thus, Defendants' motion, insofar as it seeks dismissal of every claim based on the contents of the Recognition Order, Canadian Sanction Order and/or Plan, is meritless.

## II.     COUNT ONE OF THE COMPLAINT FOR NEGLIGENCE STATES A CLAIM UPON WHICH RELIEF MAY BE GRANTED

54.     Count One of the Complaint is a claim for negligence against all Defendants.  It asserts that Defendants owed Plaintiffs, as AGIF unitholders on and after January 22, 2015, a duty to pay Plaintiffs dividends, and that Defendants breached that duty.

55.     Defendants do not dispute that FINRA rules required payment of the dividend to Plaintiffs.  Rather, they maintain that FINRA rules conflict with the terms of the Plan, which supposedly trump the FINRA rules.

56.     No such conflict exists.  The Plan does not require payment of the dividend without FINRA approval or in violation of FINRA rules. Defendants easily could have sought FINRA approval and paid the dividend in compliance with FINRA rules.[7]  Contrary to Defendants' argument, there was no inherent conflict between the Plan and FINRA rules.

57.     Even if the Plan somehow required payment of dividends to AGIF unitholders other than those entitled to receive payment pursuant to FINRA rules (which it did not), a second method of harmonizing the Plan and FINRA rules, explicitly recognized by the Third Circuit, existed.  Defendants could have met their obligations, under (a) the Plan and (b) FINRA rules, by paying dividends to those entitled to receive payment *under either one*.

58.     Although that, in certain instances, would have meant that AGIF would have paid dividends two times (*i.e.*, with respect to units held by different persons on the Unitholder Distribution Record Date and the date of payment), the court in *Karathansis v. THCR/LP Corp.*, 2007 WL 1234975 (D.N.J. April 25, 2007), *aff'd*, 298 Fed. Appx. 120 (3d Cir. 2008) recognized that it would be appropriate to harmonize any apparent conflict between the terms of a Plan and FINRA rules in this manner.  In *Karathansis,* the plan of reorganization granted stockholders as of a particular date, who sold their shares prior to a distribution, the right to receive the distribution, while FINRA (then NASD) rules granted the right to receive the distribution to a different group of stockholders   The debtor argued that a conflict existed between the Plan and

---

[7] By way of example only, Defendants could have set the payment amount in a way that would have ensured compliance with FINRA rules and the Plan, in which event the Brodski Parties would have avoided suffering any damages.

FINRA rules and, moreover, that the court had to decide whether the Plan or FINRA rules

would prevail  The *Karathansis* court explicitly rejected this argument.  It stated:

The interpretation of the Plan and the application of [FINRA] UPC Rule 11140, however, can be read in harmony, contrary to the Bankruptcy Court's holding. Indeed, at oral argument, this Court questioned whether or not the Plan and [FINRA] UPC 11140 could be read in harmony, without violating the plain terms of Section 3.04 and the application of [FINRA] UPC 11140. Debtor's counsel replied: then two things happen, Your Honor. ***The debtor pays twice*** . . ."

*Karathansis v. THCR/LP Corp.*, 2007 WL 1234975 at 8-9 (emphasis added).  The

*Karathansis* court further stated, in declining to hold that either the terms of the plan of

reorganization or FINRA rules prevailed over the other, that it "recognizes that the net

effect of this holding is that the Debtor may have to pay twice . . ."

59.    The Third Circuit explicitly adopted the holding and reasoning of the District

Court in *Karathansis*, stating " . . . essentially for the reasons given by the District Court in its

opinion entered the 26th day of April, 2007, we will affirm."  298 Fed. Appx. at 122.

60.    Although Defendants cite *Karathansis* and correctly note that the debtor in that

case was required to make a distribution to stockholders who were entitled to receive the

distribution pursuant to the plan of reorganization in question, they omit the most important

point from their brief –that the debtor had to comply with both the plan and FINRA rules, and

not just one of them, even if that meant that the debtor had to pay the distribution two times.

61.    Defendants' citations of the Canadian Sanction Order for the propositions that

there shall be no "liability as a result of payments and distributions to Unitholders" and no

"liability as a result of acting in accordance with the terms of the Plan or this Sanction Order,

save and except for any gross negligence or willful misconduct" are of no help to them.  Not

only are these provisions unenforceable in the Third Circuit for the reasons explained in Point

I(B) above, but also they have no applicability to Plaintiffs' claims. Plaintiffs seek to hold

Defendants liable ***not*** because of: (a) payments made to other unitholders, but because payments were not made to Plaintiffs; and (b) conduct in accordance with the Plan and/or Canadian Sanction Order, but, as explained above, because of the failure to comply with concurrent and additional obligations under U.S. law.  In any event, Defendants' conduct in disregarding FINRA rules regarding dividends was grossly negligent, for the reasons explained herein.

62.     In sum, Defendants' contention that a conflict exists between the Plan and FINRA rules is wrong and, even if there is a conflict, the remedy is not for the Court to choose which group of shareholders gets paid over the other.  Rather, the company must pay both groups of shareholders, so that the company is in compliance with its duties under both FINRA rules and the Plan. *Karathansis*; 298 Fed. Appx. at 122; *Karathansis*, 2007 WL 1234975 at 8-9.

63.     Thus, Count One of the Complaint should not be dismissed.

### III.     COUNT TWO OF THE COMPLAINT FOR NEGLIGENCE STATES A CLAIM UPON WHICH RELIEF MAY BE GRANTED

64.     Through Count Two of the Complaint, Plaintiffs sue for negligence, alleging that "Defendants had a duty to comply with all relevant statutes, rules, regulations, authorities and agreements concerning the establishment of the ex-date in connection with its January 2015 dividend payment," and that "Defendants breached their duties by unilaterally establishing an ex-date without approval from the applicable regulators or exchanges."

65.     In moving to dismiss, Defendants make three arguments: (a) that they could disregard FINRA rules regarding establishing an ex-date, because Defendants are not members of FINRA; (b) that even if Defendants were obligated to follow FINRA rules, they owed a duty only to FINRA and not unitholders like the Brodski Parties; and (c) that a plaintiff cannot sue for negligence based on a company's failure to comply with securities rules and regulations relating to the establishment and disclosure of an ex-date.   Defendants are wrong on all counts.

A.     <u>Defendants' Duty Of Care Required Compliance With FINRA Rules</u>

66.     The SEC has explicitly determined that FINRA rules are applicable to dividend

payments made by companies, like AGIF, that are traded on the OTC market.  Moreover,

*Karathansis*, as affirmed by the Third Circuit, confirms that FINRA rules relating to dividend

payments apply to non-FINRA members.  Accordingly, Defendants' argument that they could

disregard FINRA rules because AGIF is not a member of FINRA is baseless.

67.     As reflected in the SEC Release at pp. 2-3, the SEC has explicitly delegated to

FINRA the right to regulate the payment of dividends by OTC companies.  For example, the

SEC has stated, with respect to companies that are traded on the OTC, as follows:

. . . FINRA reviews and processes requests to announce or publish certain actions taken by issuers
of OTC Securities. FINRA performs other more limited functions relating to the processing of
certain actions by non-exchange listed companies whose securities are traded in the OTC
market. In this regard, FINRA reviews and processes documents relating to announcements for
company-related actions pursuant to Rule 10b-17 under the Act ("Rule 10b-17 Actions"). These
documents include announcements of dividends or other distributions in cash or in kind . . .

68.     Further, when it approved FINRA Rule 6490, the SEC stated:

Rule 6490 would codify the authority of FINRA's Department of Operations ("Department") to
conduct in-depth reviews of requests to process Company-Related Actions and to provide
FINRA staff the discretion not to process incomplete requests and requests for which there are
certain indicators of potential fraud. Specifically, the proposed rule would establish procedures
for the submission, review, and **determination of the sufficiency of requests made to FINRA**
to process Company-Related Actions. The proposed rule would permit the Department to
prescribe the forms, supporting documentation and procedures necessary to conduct more in-
depth reviews of requests to process Company-Related Actions. The proposed rule would
require that an issuer . . . submit a request for FINRA to review and process documentation
related to a Rule 10b-17 Action . . . within the time frames specified by . . . Rule 10b-17 . . .

*            *            *            *            *

The proposed rule would permit the Department to request additional information . . . to verify
the accuracy of the information submitted by the Requesting Party . . . **The proposed rule also
would provide that if a request to process a Company-Related Action is deficient, and the
Department determines that it is necessary for the protection of investors and the public
interest and to maintain fair and orderly markets, the Department may determine that
documentation related to a Company-Related Action shall not be processed**.

20

SEC Release at pp. 4-6 (emphasis added).  The SEC approved FINRA Rule 6490 and thereby confirmed that no dividend could be paid by any OTC company without FINRA's approval.

69.     The decision in *Karathansis*, as affirmed by the Third Circuit, confirms that issuers that are not FINRA members are subject to FINRA's dividend rules.  *Karathansis,* 298 Fed. Appx. at 122; *Karathansis*, 2007 WL 1234975 at 8-9.  The *Karathansis* court, in reaching its decision, "harmonized" "[t]he interpretation of the Plan [at issue] and the application of [FINRA] UPC Rule 11140," which it would not have done if the issuer of securities, which was not a FINRA member, was not bound by FINRA's rules regarding dividends.  *Id.*[8]

70.     Defendants do not cite any authority to support their assertion that FINRA rules relating to dividends are inapplicable to OTC issuers of securities.  The sole case on which they rely, *Ayco Co., L.P. v. Feldman*, 2010 U.S. Dist. LEXIS 112872 (N.D.N.Y Oct. 22, 2010), did not involve dividends and did not say FINRA rules apply only to FINRA members.  Similarly, FINRA UPC 11100(a) provides no support for Defendants' position.  It does not state that OTC companies are exempt from FINRA rules -- which would be contrary to the pronouncements in the SEC Release and directly conflict with FINRA Rule 6490, among others.  Further, FINRA Rule 11100 does not set forth the full extent of coverage by FINRA rules, as subpart (b) states, "The scope of coverage contained in paragraph (a) of this Rule may be expanded or limited in any Rule of this Code if specifically provided therein."  In fact, two decisions of the SEC cited

---

[8] *See also* "Your Company May Be 'Publicly Traded' Without Your Knowledge – And There May Be A Price To Pay" by Gustav Schmidt (Securities Edge, Feb. 9, 2012)("OTCBB-listed companies have received correspondence from FINRA requesting that they file a late notice as well as pay the $5,000 late filing fee" for failing to comply with FINRA rules relating to dividend payments); "Community Banks and Compliance with FINRA Rule 6490" by Susan B. Zambrecher and Christian Gonzalez (Ohio Record 2011)("It is clear that [Rule 6490] is applicable to the extent that a . . . company . . . .has stock traded on the OTCBB . . .").

by Defendants involved situations in which the SEC upheld the application of FINRA rules to

non-FINRA members traded on the OTC.[9]

        B.      **Defendants Owed The Brodski Parties A Duty Of Care With Respect To The Establishment Of An Ex-Date**

     71.    Defendants' argument that even if they were subject to FINRA rules, they did

not owe the Brodski Parties a common law duty to comply with those rules, is meritless.

*Karathansis* recognized the absolute right of shareholders to receive dividends insofar as they

are owed dividends under FINRA rules.  *Karathansis,* 298 Fed. Appx. at 122; *Karathansis*,

2007 WL 1234975 at 8-9.  The debtor in *Karathansis* would not have been obligated to comply

with both the plan at issue and FINRA rules (*i.e.*, pay twice) if it had owed no common law

obligations to shareholders.  Indeed, a common law duty of care will be deemed to exist based

on securities rules even if a private right of action under them does not exist.  *E.g. Shields v.*

*Newbridge Secs., Inc.*, 1992 Bankr. LEXIS 1706, at 19-20 (Bankr. E.D. Pa. Oct. 29,

1992)(upholding negligence claim and stating that NYSE and NASD "regulations are pertinent

in establishing the reasonable standard of care which Newbridge should have maintained.

Therefore, breaches of the duties under the pertinent regulations by Newbridge may well be

significant in imposing liability upon it for negligence"); *accord Mihara v. Dean Wittier & Co.*,

619 F.2d 814, 824 (9th Cir. 1980)(upholding breach of fiduciary duty claim and stating, "The

admission of testimony relating to [NYSE] rules was proper precisely because the rules reflect

the standard to which all brokers are held"); *As You Sow v. AIG Fin. Advisors, Inc*, 584

F.Supp.2d 1034, 1048-49 (M.D. Tenn. 2008)(upholding negligence claim and stating, "For the

reasons discussed above on NASD rules, the Court concludes the Plaintiffs have stated claims

---

[9] *In re mPhase Techs., Inc.,* Securities Exchange Act Release No. 74187 (Feb. 2, 2015) and *In re Positron Corp,* Securities Exchange Act Release No. 74216 ((Feb. 5, 2015).

for inadequate supervision . . ."); *Javitch v. First Montauk Fin. Corp.*, 279 F. Supp. 2d 931, 940 (N.D. Ohio 2003)(sustaining negligence claim based on violations of NYSE/NASD rules); *Scott v. Dime Sav. Bank*, 886 F. Supp. 1073, 1081 (S.D.N.Y. 1995)(upholding negligence claim based on violations of NASD rules and citing *Siedman v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 465 F. Supp. 1233 (S.D.N.Y. 1979) for the proposition that "violations of New York Stock Exchange rules can be remedied by state common law actions for . . . negligence").

74.     These holdings are consistent with the SEC Release, where the SEC approved a procedure for processing dividend requests, utilizing FINRA, "for the protection of investors and the public interest."  Thus, contrary to Defendants' assertions, the SEC's concern was not merely that a structure existed for regulating the marketplace, but also that investors not suffer losses.  The fact that companies must provide dividend information to FINRA, which, in turn, provides information to the marketplace through its website, does not mean that the regulatory scheme was not, as the SEC stated, "for the protection of investors."

75.     Defendants fail to cite a single case holding that they did not owe AGIF unitholders a duty of care with respect to the determination of an ex-date.  *Gold v. Ford Motor Co*, 937 F.Supp.2d 526 (D.Del. 2013), *aff'd*, 577 Fed. Appx. 120 (3d Cir. 2014), the only case referenced by Defendants, contains no such holding.  Unlike here, the plaintiff in *Gold* did not assert a negligence or other common law claim.  Rather, the plaintiff in *Gold* sought to recover exclusively under SEC Rules 10b-17 and 10b-5.  The District Court in *Gold* held that: (a) there is no private right of action under SEC Rule 10b-17; and (b) a violation of SEC Rule 10b-17 does not, by itself, automatically establish the element of *scienter* necessary to recover for fraud claim under SEC Rule 10b-5.  The Third Circuit declined to address the former ruling of the District Court and adopted the latter ruling in affirming the District Court.  However, neither the

District Court nor the Third Circuit stated – or even intimated – that a plaintiff could not bring

common law claims based on the disregard of securities regulations relating to the

establishment of an ex-date.  Indeed, the Third Circuit, in *Gold*, specifically noted that

negligence was not at issue there – stating that "Ford missed a deadline, but negligence is not

scienter" – in dismissing the Rule 10b-5 claim for failure to establish *scienter*.[10]

      C.      Plaintiffs May Sue For Negligence Based On The Failure To Comply With
             Securities Regulations and Rules Relating To Establishment Of An Ex-Date

76.      Defendants do not cite any authority holding, or provide any other support for

their novel position, that a common law claim for negligence cannot be based on the failure to

comply with securities rules and regulations regarding the establishment of an ex-date.

77.      Courts routinely permit plaintiffs to pursue negligence claims based on a failure

to comply with securities rules and regulations.  *E.g. Mihara*, 619 F.2d at 824;  *Shields*, 1992

Bankr. LEXIS 1706, at 19-20 *As You Sow*, 584 F.Supp.2d at 1048-49; *Javitch*, 279 F. Supp. 2d

at 940; *Scott*, 886 F. Supp. at 1081.  Defendants fail to address the existence of the extensive

caselaw directly on point.  Instead, they raise a "straw man":  that there is no private right of

action **under** FINRA rules and/or SEC Rule 10b-17.   Inasmuch as the Brodski Parties have not

brought a claim **under** SEC Rule 10b-17 or FINRA rules, Defendants' argument is irrelevant.

78.      Defendants' other argument is that: (a) the rules and regulations on which

Plaintiffs base Count Two all are based on SEC Rule 10b-17; and (b) conduct that violates

Section 10(b) of the Securities Exchange Act ("Section 10(b)"), including conduct inconsistent

with SEC Rule 10b-17, cannot, as a matter of law, support a common law claim and a party's

---

[10] The individual Defendants' assertion that pursuant to Canadian law, they, as opposed to
AGIF, could have owed Plaintiffs no duty of care is addressed in Point IV below.

sole recourse is to sue "under the general anti-fraud provision of the federal securities laws –

namely, Section 10(b) of the Securities Exchange Act."   Neither point is correct.

79.    As a starting point, one of the rules that Defendants disregarded relating to the

establishment of an ex-date, FINRA UPC 11140, extensively covers subjects not addressed in

SEC Rule 10b-17.  For example, FINRA UPC 11140 identifies both (a) the regulatory entities

responsible for setting an ex-date and (b) two methods for setting an ex-date.  Thus, Plaintiffs'

claim is not based exclusively on the disregard of SEC Rule 10b-17.

80.    Further, Defendants cite no case that holds, or even remotely suggests, that

claims based on a failure to comply with securities rules and regulations relating to the

establishment of an ex-date only can be brought only under Section 10(b) and cannot be for

negligence.  Courts routinely permit negligence claims to proceed when the conduct underlying

them also underlies a claim for a violation of Section 10(b).[11]  Thus, Defendants' position that a

claim under Section 10(b) is the exclusive remedy for conduct violating it is incorrect.

81.    Defendants note that SEC Rule 10b-17 states that a violation of its notice

provisions constitutes a "manipulative or deceptive device or contrivance."  Without any further

---

[11] *Eisenberg v. Gagnon*, 766 F.2d 770 (3d Cir. 1985)(permitting claims under Section 10(b) and for negligent misrepresentation); *Adv. Multilevel Concepts, Inc. v. Bukstel*, 919 F.Supp.2d 564 (E.D.  Pa. Jan. 25, 2013)(same); *Bogart v. National Community Bank*, 1992 U.S. Dist. Lexis 14958 (D.N.J. April 28, 1992)(same*); In Re. Atlantic Fin. Fed. Sec. Litig.*, 1990 U.S. Dist. Lexis 14807, at 8-9 (E.D. Pa. Oc. 31, 1990)("Defendants claim that if we allow Plaintiffs to allege negligent misrepresentation along with Rule 10(b)-5 violations, we have negated Plaintiffs' duty, delineated in *Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976), to show that Defendants had actual knowledge of their alleged wrongdoings in a Rule 10(b)-5 action.  However, it is well-established that under the pleading requirements of Rule 8, plaintiffs may plead relief in the alternative.  Plaintiffs claim that if they do not have sufficient proof for a Rule 10(b)-5 action, they should at least be able to claim damages under a negligent misrepresentation theory. If Plaintiffs are able to make the requisite showing for a negligent misrepresentation cause of action, they should not be denied such relief because they also attempt to state a cause of action under Rule 10(b)-5."); *see also Fischer & Porter v. Tolson*, 1992 U.S. Dist. LEXIS 9169 (E.D. Pa. June 30, 1992)(permitting claims Section 10(b) and negligent misrepresentation claims).

citation, Defendants then conclude, "Thus a violation of Rule 10b-17 must be brought under the general anti-fraud provision of the federal securities laws . . ." However, the conclusion that Defendants draw is unwarranted. SEC Rule 10b-17 states nowhere that conduct violating it cannot be the subject of a common law claim, let alone a negligence claim. Moreover: (a) the language on which Defendants rely is derived from Section 10(b), which makes it a violation of SEC rules to use "any manipulative or deceptive device or contrivance;" (b) the general anti-fraud provision, SEC Rule 10b-5, like SEC Rule 10b-17, was promulgated under Section 10(b); and (c) as shown in paragraph 80, courts permit negligence claims to proceed based on conduct that also violates Section 10(b) and/or SEC Rule 10b-5. There is no basis to conclude, as Defendants assert, that (1) a negligence claim is foreclosed when the conduct at issue implicates one particular rule promulgated under Section 10(b), Rule 10b-17, while (2) such a claim is indisputably allowed when the conduct implicates other rules promulgated thereunder.

82.     Defendants also assert that there is an inconsistency between (1) a determination – by *one* district court – that there is no private right of action under SEC Rule 10b-17 and (2) the assertion of negligence claims based on conduct violating SEC Rule 10b-17. However, as shown above, it is not uncommon for a plaintiff to pursue negligence claims based on violations of securities rules and regulations where there is no private right of action under a rule or regulation. *E.g. Mihara*, 619 F.2d at 824; *Shields*, 1992 Bankr. LEXIS 1706, at 19-20 *As You Sow*, 584 F.Supp.2d at 1048-49; *Javitch*, 279 F. Supp. 2d at 940; *Scott*, 886 F. Supp. at 1081.

83.     Defendants rely on *Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976) to argue that conduct that amounts to a violation of Section 10(b) cannot also support a recovery in negligence. However, *Hochfelder* did not reach any such holding. *Hochfelder* merely held that to recover under Section 10(b), a plaintiff must prove *scienter*. As explained above, numerous courts since *Hochfelder* have permitted recovery under both Section 10(b) and negligence theories.

26

83.     Accordingly Count Two of the Complaint should not be dismissed.

## IV.     COUNT THREE OF THE COMPLAINT FOR BREACH OF FIDUCIARY DUTY STATES A CLAIM UPON WHICH RELIEF MAY BE GRANTED

84.     Through Count Three of the Complaint, Plaintiffs sue the individual Defendants for breach of fiduciary duty, who move to dismiss on the ground that they supposedly did not owe Plaintiffs, as individual unitholders, a fiduciary duty under Canadian law.

85.     The individual Defendants made and lost the exact same argument in court in Canada.  In *Dobbie v. Arctic Glacier Income Fund*,  2011 CarswellOnt 1301 (Ont. S.C.J.), the Ontario Superior Court of Justice rejected the defendants' motion to strike common law causes of action pleaded against the individual Defendants.  The *Dobbie* defendants made the same argument they make now, specifically that "[t]he duty of care owed by the directors and trustees is to the Income Fund and not to the unitholders".  *Id*. at 44.   In rejecting the defendants' argument, the *Dobbie* court stated that "[a]n assertion that the trustees of the Income Fund do not owe fiduciary duties to those beneficiaries ignores the essential nature of a trust." *Id*. at 55.

86.     Similarly, in *Lawrence v. Atlas Cold Storage Holdings Inc.*, 2006 CarswellOnt 5716 (S.C.J.), addt'l reasons at 2007 CarswellOnt 479 (S.C.J.)., unitholders of a similar income trust to the one at issue brought claims against the trustees for, *inter alia*, breach of fiduciary duty.   Those claims were unchallenged at the pleadings stage.  On a pleadings motion directed at other causes of action, the Ontario Superior Court of Justice stated that "[t]he claims against Mr. Wilson in negligence and for breach of fiduciary duty were not intended to be struck, and are not struck. He was a trustee during 2001, and as noted at para. 107 of my Reasons, the alleged breaches include the failure to maintain appropriate internal policies and procedures." *Lawrence v. Atlas Cold Storage Holdings Inc.*, 2007 CarswellOnt 479 at para. 7.

87.     The conclusion in *Dobbie* is supported by other decisions by Canadian courts regarding the nature and scope of duties that can be owed by directors and officers to shareholders.  Moreover, Defendants elected to operate their business in the form of an income trust rather than a traditional corporation.  The analysis of whether or not a fiduciary duty exists under Canadian law is necessarily a contextual one that should not be determined on a preliminary pleadings motion.  Contrary to the individual Defendants' assertion that there is a blanket rule in Canadian law that directors and officers owe fiduciary duties only to the corporation, Canadian courts have held that the determination of whether a duty is owed to individual shareholders in a specific case, particularly where the business has been setup in the form of a trust, should be made with the benefit of an evidentiary record. *Anger v. Berkshire Investment Group Inc.*, 2001 CarswellOnt 329 (C.A.) at paras. 14-16.; *Holmes v. United Furniture Warehouse Ltd. Partnership*, 2012 CarswellBC 1481 (C.A.) at paras. 17, 20 and 23.

88.     The individual Defendants' reliance on *Locking v. McCowan* is baseless. Section 1.8 of the Trust states that the law governing the obligations that the individual Defendants owed to the Plaintiffs is Alberta law.  The decision of the Ontario Superior Court of Justice in *Locking v. McCowan* is not binding on the courts of other provinces, including Alberta. Further, *Locking* involved a lower court decision of the Ontario Superior Court of Justice, which has been partially reversed on appeal.[12]

---

[12] In any event, in *Locking,* a breach of trust claim against the trustees survived a preliminary pleadings challenge and was confirmed by the appellate court.  In that respect, the case is supportive of the point that trustees owe a duty of care to unitholders and must act honestly and in good faith, with a view to the best interests of both the trust and the unitholders.  If the Court concludes that the Brodski Parties may not maintain a claim for breach of fiduciary duty, they request leave to amend to add a claim against the individual Defendants for breach of trust.

89.     Accordingly, Count Three of the Complaint should not be dismissed.

## V.   COUNT FOUR OF THE COMPLAINT FOR NEGLIGENT MISREPRESENTATION STATES A CLAIM UPON WHICH RELIEF MAY BE GRANTED

90.     Through Count Four of the Complaint, the Brodski Parties seek to recover for negligent misrepresentation.  In moving to dismiss Count Four, Defendants argue that the Brodski Parties lack standing to sue for negligent misrepresentation, Plaintiffs have not adequately alleged material omissions of fact by Defendants, and Plaintiffs have not adequately alleged reasonable reliance on such omissions by Plaintiffs.  Defendants' arguments are baseless.

A.     The Brodski Parties Have Standing To Sue For Negligent Misrepresentation

91.     The assertion that Plaintiffs lack standing to sue for negligent misrepresentation, as members of the "general public" allegedly cannot sue for negligent misrepresentation, is flawed because it is based on an incorrect assumption of fact and misstatements of the law.

92.     Defendants assert that the Brodski Parties were merely members of the "general public."  However, as of December 16, 2014, the Brodski Parties were unitholders of AGIF. Cmplt. ¶ 50.  Thus, contrary to Defendants' assertion, the Brodski Parties were not members of the "public at large" or merely part of the vast "securities market."

93.     Moreover, shareholders of a publicly-traded company have standing to sue the company and its officers and directors for negligent misrepresentation.  The Brodski Parties are predominantly located in Nevada and California (Cmplt ¶¶ 4-16) – facts which Defendants disregard -- and courts in at least Nevada and California have permitted shareholders of public companies to sue for negligent misrepresentation.  *E.g. Halpern v. Lightyear Network Solutions, Inc.*, 2013 U.S. Dist. LEXIS 9654 (D. Nev. Jan 23, 2013)(granting leave to amend to pursue claim for negligent misrepresentation against a public company); *In re Adobe Systems, Inc. Sec. Litigation,* 767 F. Supp. 1023, 1029-30(N.D. Ca. 1991)(denying motion to dismiss negligent

misrepresentation claim brought by public company shareholder)*; In re Worlds of Wonder Sec. Litig.*, 721 F. Supp. 1140, 1149 (N.D. Ca. 1989)(same).[13]

B.    The Brodski Parties Adequately Allege Material Omissions

94.    Defendants concede, as they must, that they were under a "duty . . . to disclose accurately the information about the distribution" that AGIF intended to make.  Op. Br. ¶ 80.  As explained below, Defendants' disclosures did not satisfy this standard as they omitted to disclose critical information that rendered their disclosures false, misleading, and inaccurate.

95.    There is a duty to disclose: "(1) when one party makes a partial or incomplete statement that requires clarification; (2) when the parties are in a fiduciary or confidential relationship; or (3) 'where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge.'"  *Chase Manhattan Bank v. Iridium Afr. Corp.*, 197 F. Supp. 2d 120, 136-137 (D. Del. 2002); *accord Craftmatic Sec. Litig. v. Kraftsow,* 890 F.2d 628 (3d Cir. 1989)(stating that, for purposes of securities law, "when defendants voluntarily disclose information, they have a duty to disclose additional material facts . . .  to the extent that the volunteered disclosure was misleading as to a material fact").  Also, if a party makes a disclosure of present fact, as opposed to opinion or prediction, and later learns that it was false or misleading, it has a duty to make a new, corrective disclosure.  *Backman v. Polaroid Corp.,* 910 F.2d 10, 16 (1st Cir. 1990)("Obviously, if a disclosure is in fact misleading when made, and the speaker thereafter learns of this, there is a duty to correct it"); *In re Quintel Entertainment Inc. Sec. Litig.,* 72 F.Supp. 2d 283, 291-292

---

[13] Courts in this Circuit also have upheld such claims.  *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 289 (3d Cir. 1992)(reversing dismissal of negligent misrepresentation claim brought by shareholders of a publicly company); *Bogart v. National Community Bank*, 1992 U.S. Dist. Lexis 14958 (D.N.J. April 28, 1992)(sustaining negligent misrepresentation claim brought by shareholders of a publicly company); *In Re. Atlantic Fin. Fed. Sec. Litig.*, 1990 U.S. Dist. Lexis 14807, at 8-9 (E.D. Pa. Oc. 31, 1990)(sustaining negligent misrepresentation claim brought by shareholders of a publicly-traded company against the company and its officers and directors).

(S.D.N.Y. 1999)(" A duty to update prior statements may exist when a statement, reasonable at the time it is made, becomes misleading because of a subsequent event," although "there is no duty to update mere expressions of opinion or exclusively forward-looking statements").

96.     The Complaint alleges the existence of an entire regulatory scheme relating to the payment of dividends, a decision by Defendants to disregard such scheme, and a failure by Defendants to disclose their decision to disregard the applicable regulatory scheme.  Cmplt. ¶¶ 31-82.  Defendants had a duty to disclose this information because: (1) as explained in Point IV above, the individual Defendants owed Plaintiffs, as AGIF unitholders, a fiduciary duty; and (2) only Defendants could have known such information and they also would have known that U.S. unitholders expected compliance by AGIF with the U.S. regulations and rules applicable to OTC issuers. Defendants fail to address these points.  Instead, they assert that "there is no duty to make 'soft statements' of belief about a company's compliance with the law" and cite cases in support of their position.  But that is not the issue.  Plaintiffs do not sue because Defendants failed to disclose their "beliefs"; they sue because Defendants did not disclose their ***decision*** to disregard the entire U.S. regulatory scheme, which hardly amounts to "soft information." *Public Pension Fund Group v. KV Pharm. Co.*, 679 F.3d 972 (8th Cir. 2012)(denying motion to dismiss securities fraud claims based on misrepresentations about compliance with FDA regulations); *Craftmatic Sec. Litig. v. Kraftsow,* 890 F.2d 628 (3d Cir. 1989)(reversing dismissal of securities fraud claims that were based on a failure to disclose consumer protection law violations and holding that such information is not "soft information"); *In Van DeMoolen Holding N.V, Sec. Litig.*, 405 F.Supp.2d 388 (S.D.N.Y. 2005)(denying motion to dismiss securities fraud claim based on the failure to disclose company violations of NYSE rules); *Grossman v. Waste Mgmt, Inc.*, 589 F.Supp. 395,398 (N.D. Ill. 1984)(denying summary

31

judgment to a defendant accused of securities fraud that "misrepresented or withheld information concerning the company's compliance with environmental regulations").

97.     The Complaint also alleges that Defendants unilaterally established an ex-date, by deciding that unitholders as of the December 18 record date would receive dividends, and that Defendants failed to disclose that they had impermissibly set an ex-date without the review and approval of a regulator or exchange.  Cmplt. ¶ 98.  Defendants had a duty to disclose this information because the information that they did disclose -- that December 18 would be the record date for a distribution – was partial, incomplete and misleading.  Defendants' partial disclosures omitted the critical facts that they had not obtained the necessary regulatory approvals to pay a dividend and planned to select their own ex-date, December 16.[14] Defendants' sole retort is that "Arctic could not have disclosed that it would unilaterally establish the ex-date because it does not have the power to do so."  But that is disingenuous. The ex-date is the date on which a stock ceases to trade with the right to receive a dividend. Defendants themselves chose this date when they decided that investors that did not hold AGIF units as of December 15 would not receive a dividend.  In so doing, Defendants circumvented the role of FINRA, and it is their failure to disclose that they had decided to circumvent FINRA that, in part, gives rise to the Brodski Parties' negligent misrepresentation claim.

98.     The Complaint further alleges that Defendants specifically observed that the market price of AGIF units did not adjust downward following December 15, despite the fact that Defendants already had decided that purchasers of AGIF units thereafter would not receive the announced dividend, and Defendants nevertheless declined to provide corrective information to the market so that such purchasers would know that they would not receive the

---

[14] As explained above, the record date is irrelevant to distribution entitlement when the distribution is 25% or more of the security's price.  FINRA UPC 11140.

dividend.  Cmplt. ¶¶ 77-81.  In view of the fact that investors plainly had been misled by

Defendants' press release, Defendants had a duty to provide such corrective information.

*Backman*, 910 F.2d at 16; *In re Quintel Entertainment Inc. Sec. Litig.*, 72 F.Supp. 2d at 291-2.

Defendants have no response to the foregoing, except to assert that "the press release accurately

stated the material information about the distribution, including the record date" of the dividend.

Op.. Br. ¶ 79.  That is simply not so.  The Press Release did not identify an ex-date (approved

by FINRA or otherwise) or otherwise provide information from which it could be determined.

It merely divulged that a record date had been set.  However, as stated above, under FINRA

rules, it is the ex-date, and not the record date, that determines which unitholders receive a

dividend.  FINRA UPC 11140.  The fact that Defendants did not make the required disclosure is

confirmed by the facts that (a) the price of AGIF units did not decline to reflect the dividend, or

at all, for five weeks; and (b) the market price of AGIF units plunged when, on January 23,

AGIF finally revealed that any new purchaser (in addition to purchasers between December 16

and January 22) would not receive the dividend.  Cmplt. ¶¶ 39-46.

      C.     The Brodski Parties Adequately Allege Reasonable Reliance

      99.     Contrary to Defendants' contentions, the Brodski Parties have adequately alleged the

reasonable reliance element of their negligent misrepresentation claim.

      100.     Plaintiffs have alleged that, "Plaintiffs relied to their detriment on the artificially

inflated market price of AGIF units when they purchased the units from December 16, 2014 to

January 22, 2015, and would not have purchased the units at that price had they known of AGIF's

material omissions."  Cmplt.¶ 101.  Plaintiffs further alleged that over 26 million AGIF units traded

on the OTC between December 16, 2014 and January 22, 2015 (*Id*. ¶ 46), and when the information

that Defendants had failed to disclose was revealed to the market, the market price of AGIF units

plunged by approximately 75% (*Id*. ¶ 45).   Based on these allegations, Plaintiffs have adequately

alleged reasonable reliance based on a fraud on the market theory. *Winer Family Trust  v. Queen*, 2004 U.S. Dist. LEXIS 19244, at *9 n.3 (E.D. Pa. Sept. 27, 2004)(holding that the plaintiff had adequately alleged reasonable reliance based on a fraud on the market theory and stating, "The Court concludes that by alleging that, *inter alia*, Pennexx's stock price sharply rose or fell in response to unexpected disclosures by the company, Lead Plaintiff has adequately pled facts that give rise to an inference that Pennexx stock traded in an efficient market"); *Seidman v. American Mobile Sys., Inc.*, 813 F. Supp. 323, 325 & n.1 (E.D. Pa. 1993) (finding that the complaint adequately pled the existence of an efficient market by alleging that the stock price plunged following sudden disclosures by the corporation); *accord Hayes v. Gross*, 982 F.2d 104, 107 n.1 (3d Cir. 1992)(". . . on a motion to dismiss the question is whether plaintiff has alleged that the stock traded in an efficient market, or whether any of the facts alleged give rise to such an inference," when a plaintiff is relying on the fraud on the market theory).

101.    Defendants' contention that the Brodski Parties cannot, as a matter of law, rely on the fraud on the market theory, because AGIF is traded on the OTC and the OTC supposedly is an unreliable and inefficient market, is baseless.  Numerous courts have permitted plaintiffs to rely on the fraud on the market theory when bringing claims against OTC companies. *E.g. Hoexter v. Simmons*, 140 F.R.D. 416, 419 (D. Ariz. 1991)("The court agrees with plaintiffs that the mere fact that the Valley National shares were traded on the OTC market rather than on a national exchange does not prevent certification of the Class. Based on the authorities cited by plaintiffs and the rationale underlying the fraud-on-the-market theory, the court has determined as a preliminary matter that the OTC market as a whole and the market for Valley National shares in particular were sufficiently efficient to allow plaintiffs to establish reliance by employing that theory"); *accord Finkel v. Docutel/Olivetti Corp.*, 817 F.2d 356, 357 (5th Cir.

1987) (recognizing the applicability of fraud on the market theory to claims brought against an

OTC issuer); *Winer Family Trust v. Queen*, 2004 U.S. Dist. LEXIS 19244, at *9, n.3 (E.D. Pa.

Sept. 27, 2004)(same); *Cammer v. Bloom*, 711 F.Supp. 1264, 1277 (D.N.J. 1989)(same and

identifying additional cases applying the fraud on the market theory to OTC companies).[15]

102.    Defendants also argue that Plaintiffs (and every other purchaser of AGIF units

who paid at the inflated market price) should have known that they would not receive dividends

because: (a) they knew that they were purchasing AGIF units after the December 18 record

date; (b) they should have known that Defendants would disregard FINRA rules and/or not to

rely on FINRA to receive information about a dividend payment; (c) FINRA did not possess up

to date information about AGIF; (d) information about AGIF possessed by the OTC Markets

Group was not current; and (e) Plaintiffs should have known that investing in companies trading

on the OTC is risky.  Each of these arguments is meritless.

103.    Plaintiffs had no reason to conclude that they would not receive the dividend

based on purchases of AGIF units after the record date, because the right to receive dividends,

under FINRA rules, is based on the ex-date, which is set exclusively by FINRA, and no ex-date

had been set by FINRA.  An OTC investor is entitled to a dividend if it owns shares

immediately prior to the ex-date, even if it buys shares the day prior to the ex-date. FINRA UPC

11140.  The record date is irrelevant for these purposes.  *Id.*  It thus was not unreasonable for

Plaintiffs to conclude that they would receive the dividend as FINRA had not set an ex-date.

---

[15] As there indisputably are decisions holding that the fraud on the market theory applies to OTC
companies, Defendants' citation to cases in which courts stated that they were unaware of such
decisions is of no help to Defendants.  Similarly, the fact that the court in *Krongman v. Sterritt*,
202 F.R.D. 467 (N.D. Tex. 2001) concluded that the market for the particular stock in question
was inefficient, and thus the fraud on the market theory was inapplicable to that particular stock,
is irrelevant to whether the fraud on the market theory applies with respect to AGIF units.

104.    It likewise was not unreasonable for Plaintiffs to believe that Defendants would comply with FINRA rules and/or that information provided by FINRA regarding dividends would be accurate.  As explained above, OTC companies like AGIF are bound by FINRA rules relating to dividend payments.  Defendants provide no reason why it was unreasonable to expect that AGIF would comply with its regulatory requirements, and none is apparent.[16] Although the FINRA website does contain a routine disclaimer stating that no one can sue FINRA based on information set forth on it, that does not mean, as Defendants would have it, that FINRA does not provide the official and only reliable information regarding dividend payments to be made by OTC issuers regulated by FINRA.[17]  Indeed, the only reasonable approach for an investor is to believe that an OTC issuer will comply with its regulatory obligations and that FINRA, which must review and approve requests to pay dividends, has accurate information relating to the payment.

105.    Although Defendants maintain that the Brodski Parties somehow should have known that information possessed by FINRA relating to AGIF was inaccurate, they provide no explanation for their contention.  Defendants identify no information about AGIF that FINRA possessed that the Brodski Parties could have accessed and should have perceived as inaccurate, let alone that should have led the Brodski Parties to conclude that no reliable information about AGIF could be obtained through FINRA.

---

[16] Defendants assert that AGIF never complied with FINRA regulations.  However, Defendants identify no prior instance in which AGIF was required to, but did not, comply with FINRA rules relating to dividends, let alone establish why the Brodski Parties should have known that AGIF had decided to disregard FINRA rules relating to dividends.

[17] Defendants' reliance on *In re mPhase Techs., Inc.,* Securities Exchange Act Release No. 74187, at 23 n. 93 (Feb. 2, 2015) and *In re Positron Corp,* Securities Exchange Act Release No. 74216, at 17 n. 62 ((Feb. 5, 2015) to assert that information published by FINRA somehow is unreliable is baseless.  They say no such thing.

106.     Although Defendants assert that information about AGIF on the website of ***OTC Markets Group***, which is a public company unrelated to FINRA, is incorrect or incomplete, they provide no explanation as to why that should have caused the Brodski Parties to conclude that they could not rely on information from ***FINRA*** about AGIF dividend payments.

107.     Defendants' assertion that Plaintiffs should have expected that they would not receive dividends because investing in OTC companies is risky makes no sense.  As the SEC explained in the *Positron* decision cited by Defendants, investing in a security that has a risk of dropping in value is entirely different from being deprived of a dividend to which one is entitled under applicable law.  The SEC stated:  "Investors in OTC Securities are entitled to assume that "the risk associated with investing in [a market over which FINRA has such authority] is market risk rather than the risk that the promoter or other persons exercising substantial influence over the issuer is acting in an illegal manner."  *In re Positron Corp,* Securities Exchange Act Release No. 74216, at 16 (Feb. 5, 2015).  The Brodski Parties absolutely did not assume the risk, by investing in AGIF, that Defendants would disregard their legal obligations.

108.     Thus, Count Four of the Complaint should not be dismissed.

**VI.     COUNTS FIVE AND SIX  OF THE COMPLAINT FOR VIOLATION OF SEC RULE 10B-5 AND AND COMMON LAW FRAUD STATE CLAIMS UPON WHICH RELIEF MAY BE GRANTED**

109.     Pursuant to Counts Five and Six of their Complaint, Plaintiffs sue for violation of SEC Rule 10b-5 and common law fraud, respectively. Defendants' sole challenge to these claims is that Plaintiffs supposedly have not adequately alleged an element common to both of them:  that Defendants omitted to disclose information with *scienter*.

110.     Defendants concede, as they must, that a plaintiff can adequately allege *scienter* by setting forth factual allegations of recklessness.  Op. Br. ¶ 17.

111.    Plaintiffs have adequately alleged that Defendants omitted to disclose the information in question recklessly.  The Complaint specifically alleges that: (a) in March 2015, Defendant "Adams admitted that he had observed after the issuance of the Press Release that there was no change in the market price of AGIF units, despite AGIF's assertion that it had set December 16, 2014 as the ex-date;" (b) Defendant "Adams admitted [that the issuance of the Press Release] should have caused the share price to have fallen by approximately 75% on December 16, 2014, the first day the units supposedly began to trade without the right to receive the dividend;" and (c) "Adams further informed [Plaintiff Eldar Brodski] that despite this awareness that AGIF units were trading at an unjustified several hundred percent premium, Defendants affirmatively decided not to take any corrective action to ensure that current or potential shareholders had the information contained in the Press Release, of which such current and potential shareholders so obviously were unaware."  Cmplt. ¶¶ 77-78.  In short, Plaintiffs have alleged that Defendants made a conscious decision to withhold from the market material information concerning the dividend, and thereby misled investors, including Plaintiffs, to overpay for AGIF units and/or to make purchases in the belief that no ex-date had been set.

112.    This is quintessential recklessness.  Defendants knew that they had made an announcement about dividends.  They also knew that the market was not reacting to the announcement in a way that made any sense if, as Defendants had decided, purchasers of AGIF units after December 15 would not receive dividends.  Plainly, in view of the fact that the price of AGIF units did not drop for five weeks after December 15, Defendants did not communicate this information to the market in a way that any reasonable investor could have understood it.  Rather than fix the problem that they had created, and of which they were well-aware, Defendants elected not to make any corrective disclosures, despite their duty to do so.  *Backman*

*v. Polaroid Corp.,* 910 F.2d 10, 16 (1st Cir. 1990); *In re Quintel Entertainment Inc. Sec. Litig.,* 72 F.Supp. 2d 283, 291-292 (S.D.N.Y. 1999).  As a result, investors like Plaintiffs overpaid for AGIF units on and after December 16 and suffered losses that they could have avoided.

113.    Defendants note that they made a variety of announcements relating to the dividend, which they claim demonstrates that they did not act with *scienter*.  But those announcements demonstrate no such thing and, if anything, demonstrate Defendants' *scienter*. Defendants point to nothing that disclosed that Defendants had decided to make the ex-date December 16.  None of their announcements contained any such information.  If anything, Defendants' issuance of press releases and other announcements describing certain aspects of the dividend reinforces the point that they acted recklessly, inasmuch as they continued to issue information about the dividend but excluded information regarding the ex-date.  As admitted by Defendant Adams, Defendants knew that the entire marketplace had been misled by their announcements and nevertheless made the conscious decision not to make any corrective disclosures while continuing to communicate with the market.

114.    Defendants also assert that the fraud claims in questions somehow are comparable to the Rule 10b-5 claim brought by the plaintiff in *Gold v. Ford Motor Company*, 937 F.Supp.2d 526 (D. Del. 2013).  Defendants are wrong.  In *Gold*, the plaintiff argued that it could establish *scienter* solely by alleging the defendant's violation of Rule 10b-17.  Here, as explained above, the allegations of *scienter* extend beyond Defendants' violation of SEC Rule 10b-17.  Plaintiffs have alleged that Defendants became aware that their disclosures regarding dividends had misled purchasers of AGIF units after December 15 to believe that AGIF would pay the 75% dividend to them, yet Defendants consciously chose not to advise investors that

they had decided not to pay such dividend to such purchasers.  The plaintiff in *Gold* made no

even remotely comparable allegation of recklessness.

115.    Counts Five and Six of the Complaint should not be dismissed.


Dated:  March 14, 2016

CROSS & SIMON, LLC

*/s/ Kevin S. Mann*
Christopher P. Simon (No. 3697)
Kevin S. Mann (No. 4576)
1105 North Market Street, Suite 901
Wilmington, Delaware 19801
 (302) 777-4200
csimon@crosslaw.com
kmann@crosslaw.com

-and-

MITCHELL SILBERBERG & KNUPP LLP
David Gordon, Esquire
Jaclyn H. Grodin, Esquire
12 East 49th Street, 30th Floor
New York, New York 10017-1028
(212) 509-3900
dbg@msk.com
jhg@msk.com

*Attorneys for the Plaintiffs*