## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 15 |
| | : | |
| Arctic Glacier International, Inc. | : | Case No. 12-10605(KG) |
| | : | (Jointly Administered) |
| Debtors in a foreign proceeding. | : | |
| _____ | : | |
| Eldar Brodski Zardinovsky a/k/a Eldar Brodski | : | |
| a/k/a Eldar Brodski (Zardinovsky), EB Books, Inc., | : | |
| EB Design, Inc., EB Online, Inc., EB Imports, Inc., | : | |
| Lazdar Inc., Eldar Brodski Inc., Y Capital Advisors | : | |
| Inc., Valley West Realty Inc., Ruben Brodski, Ruben | : | |
| Brodski Inc., Ester Brodski, and Yehonathan Brodski, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Adv. No. 15-51732(KG) |
| | : | |
| Arctic Glacier Income Fund, James E. Clark, Gary | : | |
| A. Filmon, David R. Swaine, and Hugh A. Adams, | : | |
| | : | |
| Defendants. | : | |
| _____ | : | |

## MEMORANDUM OPINION

On October 30, 2015, Eldar Brodski Zardinovsky and others[1] (collectively "Plaintiffs") brought a post-petition adversary complaint ("Complaint" or "Compl.") (D.I. 1) against Arctic Glacier Income Fund ("AGIF"), James E. Clark, Gary A. Filmon, David R. Swaine, and Hugh A. Adams (collectively "Defendants" or, in reference to aforementioned persons, "Individual Defendants") for negligence, breach of fiduciary duty, negligent misrepresentation, violation of § 10(b) of the 1934 Securities Exchange Act

---

[1] EB Books, Inc., EB Design, Inc., EB Online, Inc., EB Imports, Inc., Lazdar Inc., Eldar Brodski Inc., Y Capital Advisors Inc., Valley West Realty Inc., Ruben Brodski, Ruben Brodski Inc., Ester Brodski, and Yehonathan Brodski.

and Rule 10b-5, and common law fraud.  Defendants filed a Motion to Dismiss the Complaint (the "Motion") (D.I. 15) on January 21, 2016.  On March 14, 2016, Plaintiffs filed their Opposition to the Motion ("Opp.") (D.I. 27).  Defendants filed a Reply Brief in Support of the Motion on April 7, 2016 ("Reply") (D.I. 30).  The Court heard oral argument on April 19, 2016 ("4/19/16 Hr.").[2]

This case is about the preclusive effect of Defendant AGIF's confirmed reorganization plan (the "Plan") in regard to its dividend distribution[3] procedure, as well as the effectiveness of various provisions in the Plan and related orders (the "Orders") that release Defendants from liability associated with their payment of dividends (the "Releases").  Plaintiffs purchased shares, called units, in AGIF between and including December 16, 2014 and January 22, 2015.  On January 22, 2015, pursuant to the Plan's distribution procedure, Defendants paid dividends to those who held units as of December 15, 2014 – in other words, to those who sold their units to Plaintiffs (the "Selling Unitholders[4]").  The Complaint alleges that under U.S. securities law, Defendants should have paid dividends to Plaintiffs, rather than to the Selling Unitholders.

---

[2] The Court has jurisdiction pursuant to Paragraphs 3(c) and (d) of its Order Recognizing and Enforcing the Unitholder Claims Procedure Order of the Canadian Court ("Recognition Order"), entered on September 16, 2014 (D.I. 17-5).  The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 157(b)(1) and (b)(2)(P).  Plaintiffs consent to the entry of a final order or judgments by this Court pursuant to Local Rule 7008-1 of the Delaware Bankruptcy Court.  Venue is proper in this District and in the Court under 28 U.S.C. § 1410.

[3] Although the term *corporate distribution* includes *dividend payment* as well as other forms of money transfers to shareholders, this Memorandum Opinion will refer to *distributions* and *dividends* interchangeably.  *See* DISTRIBUTION, Black's Law Dictionary (10th Ed. 2014).

[4] "Unitholder" is the term used in the Plan for shareholders.

The Motion contends that the Releases insulate Defendants from liability. Motion ¶¶ 26-31. It also asserts that under the doctrine of *res judicata* Defendants were only obligated to make distributions pursuant to the Plan, not U.S. securities law, and therefore Defendants violated no law when paying dividends. Motion ¶¶ 24-25, 52-58.[5]

Plaintiffs mount several challenges to Defendants' defenses, arguing that (1) U.S. securities law imposed "concurrent and additional obligations" on Defendants that they failed to meet (Opp. ¶¶ 51, 61), (2) that the Releases apply only to Defendants' distributions to the Selling Unitholders, not the required payments to Plaintiffs that Defendants omitted (Opp. ¶ 51), (3) that the Releases violate Plaintiffs' Due Process rights under the U.S. Constitution (Opp. ¶¶ 46-51), and (4) that the Releases are ineffective as to the Individual Defendants (Opp. ¶ 51). The Court finds the challenges insufficient to withstand the Motion. Therefore, the Court will grant the Motion.

## FACTS

### A. The Parties

Defendant AGIF was an income trust headquartered in Canada and listed on the Canadian Securities Exchange ("CSE"), under the symbol "AG.UN." Compl. ¶ 18; Motion ¶¶ 7, 12; Declaration of Marcos A. Ramos, Esq. in Support of Defendants' Motion to Dismiss the Complaint (D.I. 17)("Ramos Dec."), Ex. A (First Report of the Monitor Alvarez & Marsal Canada Inc., In re Arctic Glacier International Inc., et al., No. CI 12-01-

---

[5] The Motion also defends against each of Plaintiffs' causes of action on the merits. The Court finds it unnecessary, however, to address Plaintiffs' claims individually on the merits since under the following analysis they are collectively dismissed.

76323 (Can. M.Q.B. Mar. 12, 2012)("First Monitor's Report") ¶ 3.1), Ex. I ("Arctic Glacier Income Fund Announces Unitholder Distribution Record Date," December 15, 2014, press release posted to the CSE ("December 15, 2014 Press Release")).[6]  AGIF's units traded on the U.S.-based Over-The-Counter ("OTC") market under the symbol "AGUNF."  Compl. ¶¶ 31, 34, 53, 60; Opp. ¶ 6.

Individual Defendants James E. Clark, Gary A. Filmon, and David R. Swaine have at all relevant times been Trustees of AGIF; Individual Defendant Hugh A. Adams has at all relevant times been Secretary of AGIF.  Compl. ¶¶ 19-22; Motion ¶ 7.

Plaintiffs purchased all their AGIF units on the OTC through U.S. brokers between and including December 16, 2014, and January 22, 2015.  Compl. ¶¶ 50, 53, 55.

B. AGIF's Bankruptcy Proceedings

On February 22, 2012, AGIF and its affiliates ("Debtors") initiated insolvency proceedings in Canada under the Companies' Creditors Arrangement Act ("CCAA").  Compl. ¶ 26.  The CCAA Court issued an order under the CCAA dated February 22, 2012 ("Initial Order"), which appointed Alvarez & Marsal Canada Inc. as Monitor (the "Monitor") of Debtors and permitted Debtors to file a plan of compromise or arrangement.  Ramos Dec., Ex. B (Plan of Compromise and Arrangement, dated May 21, 2014 (as amended August 26, 2014 and January 21, 2015) (the "Plan," as referred to in the Introduction, *supra*)).  Debtors filed the Plan on May 21, 2014.  Compl. ¶ 28.  Also on

---

[6] Under the motion-to-dismiss standard, *see* Legal Standard section, *infra*, the Court takes judicial notice of publicly available documents.  *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196-97 (3d Cir. 1993).

February 22, 2012, the Monitor commenced ancillary proceedings in the Court under Chapter 15 of the United States Bankruptcy Code.  Compl. ¶ 26; Motion ¶ 8; First Monitor's Report ¶ 4.1.

Debtors' creditors and unitholders accepted the Plan, with over 65% of unitholders participating in the vote, and 99.81% of the voting unitholders approving the Plan. Ramos Dec., Ex. C (Monitor's Certificate (Re. Plan Implementation Date), *In re Arctic Glacier International In., et al.*, No. CI 12-01-76323 (Can. M.Q.B. Jan. 22, 2015)), Ex. D (Seventeenth Report of the Monitor Alvarez & Marsal Canada Inc., *In re Arctic Glacier International Inc., et al.*, No. CI 12-01-76323 (Can. M.Q.B. Aug. 26, 2014) §§ 4.19-.20, Appx. H).  The CCAA Court approved and sanctioned the Plan.  Ramos Dec., Ex. Q (Sanction Order issued by the CCAA Court on September 5, 2014 ("Sanction Order")).   In the Sanction Order the CCAA Court ordered and declared "that the Plan . . . is hereby sanctioned and approved pursuant to the CCAA."  Sanction Order ¶ 9.  The CCAA Court ordered that the terms of the Plan governed the conduct of the Debtors and related parties as of the signing of the Sanction Order[7]:

> the Arctic Glacier Parties[8], the Monitor and the CPS, as the case may be, ***are hereby authorized and directed to take all steps and actions necessary or appropriate to implement the Plan in accordance with and subject to its terms and conditions, and enter into, adopt, execute, deliver, complete, implement and consummate all of the steps, . . . distributions***, payments, deliveries, allocations, instruments, agreements, and releases contemplated by, and subject to the terms and conditions of, the Plan, and all such steps and actions are hereby approved.  Further, to the extent not previously given, all necessary approvals to take such actions shall be and are hereby

---

[7] The Sanction Order was signed on September 5, 2014.

[8] "Arctic Glacier Parties" is defined in the Plan as including AGIF and various other entities, but not the Individual Defendants.  Plan at 1.

deemed to have been obtained from the Directors, Officers, or Trustees, as applicable . . . .

Sanction Order ¶ 12 (emphasis added).

On September 16, 2014, the Court recognized the Sanction Order and gave "full force and effect in the United States" to its provisions. Ramos Dec., Ex. E (Order Recognizing and Enforcing Order of Canadian Court Sanctioning and Approving CCAA Plan, September 16, 2014 ("Recognition Order") at 2). (The Sanction Order and the Recognition Order will be referred to collectively as the "Orders," as noted in the Introduction, *supra*).

Under the supervision of the Monitor and the CCAA Court, Debtors sold substantially all of their business and assets. Compl. ¶ 27. With the sale proceeds Debtors paid their creditors in full and distributed most of the remainder to unitholders. Compl. ¶ 27; Plan, recitals.

C. Distributions Under the Plan

The Plan presents one, and only one, procedure for making distributions, whether small (below 25% of the value of the subject security) or large (25% or above the value of the subject security):

> The Monitor shall declare a Unitholder Distribution Record Date prior to any distribution . . . . On the Plan Implementation Date or on any Distribution Date, as the case may be, the Monitor shall transfer amounts as determined by the Monitor in accordance with the Consolidated CCAA Plan . . . to the Transfer Agent. . . . in no event later than five (5) Business Days following receipt of the Unitholder Distribution, *the Transfer Agent shall distribute each Unitholder Distribution . . . to each Registered Unitholder, as of the applicable Unitholder Distribution Record Date* . . . based on each Registered Unitholder's Pro Rata Share . . . .

Plan § 6.2 Distributions from the Unitholders' Distribution Cash Pool (emphasis added).

The Unitholder Distribution Record Date must be "at least 21 days prior to a contemplated Unitholder Distribution . . ." Plan § 1.1 Definitions. Thus, under the terms of the Plan, *any* distribution, no matter its size, must be made to those who hold units as of the Unitholder Distribution Record Date, which must be at least 21 days prior to the date on which the distribution is actually paid out, i.e., the payable date.

Furthermore, the Sanction Order makes clear that the Plan's distribution procedure is comprehensive, precluding, at the Monitor's discretion, any authority beyond the CCAA, the Plan, and court orders:

> THIS COURT ORDERS AND DECLARES that, in addition to the Monitor's prescribed rights under the CCAA, and the powers granted by this Court to the Monitor and the CPS, as the case may be, the powers granted to the Monitor and the CPS are expanded as may be required, and the Monitor and CPS are empowered and authorized before, on or after the Plan Implementation Date[9], to take such additional actions and execute such documents . . . ***as the Monitor and the CPS consider necessary or desirable*** in order to perform their respective functions and fulfill their respective obligations under the Plan, the Sanction Order and any Order of this Court in the CCAA Proceedings and to facilitate the implementation of the Plan and the completion of the CCAA Proceedings, including to . . . (ii) ***administer and distribute the Available Funds***, (iii) establish, hold, administer and ***distribute . . . the Unitholders' Distribution Cash Pool***, . . . (v) effect . . . ***distributions to the Transfer Agent in respect of distributions to be made to Unitholders*** . . . and, in each case where the Monitor or CPS, as the case may be, takes such actions or steps, ***they shall be exclusively authorized and empowered to do so, to the exclusion of all other Persons*** including the Artic Glacier Parties, ***and without interference from any other Person***.

---

[9] The Plan Implementation Date was January 22, 2015.

Sanction Order ¶ 34 (emphasis added).   Under the Plan "'Person' is to be broadly interpreted and includes any . . . Government Authority[10] or any agency, regulatory body, officer or instrumentality thereof or any other entity, wherever situate or domiciled . . ." Plan § 1.1 Definitions, defining "Person."

Section 8.3 of the Plan provides further evidence that the Plan's distribution procedure is comprehensive:

> The steps, transactions, settlements and releases to be effected in the implementation of the Consolidated CCAA Plan shall occur, and be deemed to have occurred, in the following order without any further act of formality . . .
>
> (a) the Monitor . . . shall use the Available Funds to fund the following reserves and distribution cash pools in the order specified below:
>> (i)      Administrative Costs Reserve;
>> (ii)     Insurance Deductible Reserve;
>> (iii)    Unresolved Claims Reserve;
>> (iv)    Affected Creditors' Distribution Cash Pool; and
>> (v)     Unitholders' Distribution Cash Pool; and
>
> administer such reserves and distribution cash pools pursuant to and in accordance with the Consolidated CCAA Plan;
>> * * *
>
> (d)    the steps, assumptions, distributions, transfers, payments, contributions, liquidations, dissolutions, wind-ups, reduction of capital, settlements and releases set out in Schedule "B" of the Consolidated CCAA Plan shall be deemed in the order specified therein . . .

Plan § 8.3 Plan Implementation Date Steps and Transactions.

Schedule "B" of the Plan, titled "Specificed Plan Implementation Date Steps," states:

---

[10] "Government Authority" is defined as "any government, regulatory or administrative authority . . . having or purporting to have jurisdiction on behalf of any nation . . ."  Plan § 1.1 Definitions, defining "Government Authority."

> In order to effect the wind-up, liquidation and dissolution of certain of the
> Arctic Glacier Parties to facilitate the satisfaction of Proven Claims and a
> distribution by the Fund to Unitholders pursuant to and in accordance with
> the Consolidated CCAA Plan, the following steps, assumptions,
> distributions, transfers, payments, contributions, liquidations, dissolutions,
> wind-ups, reduction of capital, settlements and releases shall be deemed to
> occur (a) immediately after the completion of the step set out in Section
> 8.3(c) of the Consolidated CCAA Plan; (b) in the order specified in this
> Schedule "B"; and (c) in the manner specified in this Schedule "B".

Plan, Schedule "B" Specified Plan Implementation Date Steps.  The last step in Schedule

"B" is "Step 30: Distribution by Arctic Glacier Income Fund," which reads:

> Arctic Glacier Income Fund shall be deemed to have paid a distribution to
> each Unitholder in the amount of their Pro Rata Share of the Unitholders'
> Distribution Cash Pool immediately following the completion of Steps 1
> through 29 above and such amount shall be transferred by the Monitor to
> the Transfer Agent and distributed by the Transfer Agent to the Unitholders
> in accordance with Section 6.2 of the Consolidated CCAA Plan.

Plan, Schedule "B" Specified Plan Implementation Date Steps, Step 30.  Section 8.3 only

allows for distributions "in accordance with" the Plan (i.e., section 6.2); Schedule "B" only

allows for distributions "in accordance with Section 6.2 of the . . . Plan."  There is no room

in either section 8.3 or in Schedule "B" for anything other than the narrowly prescribed

distribution procedure provided in section 6.2, limiting distributions "to each Registered

Unitholder, as of the applicable Unitholder Distribution Record Date . . . ."  Plan § 6.2.

Article 6 of the Plan, entitled "Provisions Regarding Distributions and Payments,"

contains several sections, some of which begin with the prefatory phrase: "Subject to any

restrictions contained in Applicable Laws . . . ."  Plan §§ 6.10(a) Assignment of Claims

Prior to the Creditors' Meeting; 6.10(b) Assignment of Claims Subsequent to the

Creditors' Meeting; 6.11 Assignment of Trust Units for Voting Purposes.  Section 6.13 of

the Plan regards requirements of the applicable tax authority:

> The Artic Glacier Parties and the Monitor shall be entitled to deduct and
> withhold, or direct the Transfer Agent to deduct and withhold, from any
> distribution, payment or consideration otherwise payable to an Affected
> Creditor or Unitholder such amounts . . . as the Arctic Glacier Parties, the
> Monitor or the Transfer Agent, as the case may be, ***is required or entitled to
> deduct and withhold with respect to such payment under the Income Tax
> Act (Canada), the IRC, or any other provision of any Applicable Law***.

Plan § 6.13 Withholding and Reporting Requirements (emphasis added).  In contrast,

section 6.2 of the Plan, regarding "Distributions from the Unitholders' Distribution Cash

Pool," does not contain any reference to "Applicable Law."  The omission indicates that

the Plan's drafters did not intend to impose the requirements of any applicable laws on

section 6.2.  Thus, under the Plan and Sanction Order, the Monitor is obligated to make

distributions according to the stated steps in section 6.2 of the Plan, subject only to its

own discretion and not to "Applicable Law."

    D.  <u>Distributions Under the U.S. Securities Laws</u>

Rule 10b-17 of the Securities and Exchange Act of 1934 ("Rule 10b-17") establishes

an issuer's mandatory set of disclosures if it trades on the OTC and wishes to make a

distribution.  Compl. ¶ 56.  Notice of a distribution must be given to the Financial

Industry Regulatory Authority ("FINRA")[11] no later than 10 days prior to the record date

---

[11] FINRA is a self-regulatory organization that regulates the OTC market pursuant to authority granted by the Securities and Exchange Commission ("SEC").  Compl. ¶ 1.  It is the successor to the National Association of Securities Dealers, Inc. ("NASD").  FINRA News Release, Monday, July 30, 2007, *available at* https://www.finra.org/newsroom/2007/nasd-and-nyse-member-regulation-combine-form-financial-industry-regulatory-authority.   FINRA "has the authority to determine the date on which a holder of AGIF units trading in the United States . . . has to own such units in order to receive a dividend."  Compl. ¶ 34.  "FINRA processes requests

of an issuer's offer of dividends.  Compl. ¶ 58;  17 C.F.R. § 240.10b-17(a) and (b)(1); *In re THCR/LP Corp.*, No. 04-46898/JHW, 2006 WL 530148 at *4 (Bankr. D.N.J. Feb. 17, 2006). The SEC gave FINRA power to regulate payment of dividends.  Compl. ¶ 61; SEC Release No. 34-62434 (July 1, 2010) at *1.  FINRA Rule 6490 ("Rule 6490") creates procedures within FINRA for review and determination of the sufficiency of requests to issue dividends.  Compl. ¶ 63; SEC Release No. 34-62434 (July 1, 2010) at *1.

FINRA is authorized by the SEC to adopt and administer the Uniform Practice Code ("UPC"), "the rules and regulations governing [OTC] secondary market securities transactions."[12]  *In re THCR/LP Corp.*, 2006 WL 530148 at *4.  UPC Rule 11140 determines which unitholders are entitled to a distribution.  *Id*. at *5; NASD Notice to Members 00-

---

to announce and publish certain corporate actions [including cash dividends and distributions] from issuers whose securities are quoted on the OTC . . . [and] publishes these announcements on the Daily List on its website."  Compl. ¶ 35, 36, 37.

[12] "The UPC sets forth a basic framework of rules governing broker-dealers with respect to the settlement of OTC Securities."  SEC Release No. 62434 (July 1, 2010), n. 8.  FINRA lacks privity with issuers of OTC Securities: "FINRA does not impose listing standards for securities and maintains no formal relationship with, or direct jurisdiction over, issuers."  SEC Release No. 62434 (July 1, 2010) at *2-3.  Despite the lack of privity between FINRA and issuers, the SEC notes the following possible consequences of an issuer failing to observe the requirements of Rule 10b-17 :

> The other commenter questioned whether the proposed fees for providing Company-Related Action processing services might cause issuers to effect corporate actions without notifying FINRA*.  In response to this point, FINRA noted that an issuer that fails to notify FINRA of a proposed corporate action, as required by Rule 10b-17 is potentially violating an anti-fraud rule of the federal securities laws and stated that where it has actual knowledge of issuer non-compliance with Rule 10b-17, FINRA will use its best efforts to notify the Commission.*

SEC Release No. 62434 (July 1, 2010) (emphasis added).

54 (August 2000).   (Hereinafter, Rule 10b-17, Rule 6490, SEC Release No. 62434, UPC 11140, and NASD Notice to Members 00-54 will be referred to as the "FINRA Rules."[13])

The UPC provisions determine which unitholders are entitled to a distribution by setting two dates: the "record date" and the "ex-dividend date" ("ex-date").  *In re THCR/LP Corp.*, 2006 WL 530148 at *5.  The record date refers to "the date fixed by the . . . issuer for the purpose of determining the holders of equity securities . . . entitled to *receive* dividends . . . or any other distributions."  UPC Rule 11120(e) (emphasis added). Ex-date means "the date on and after which the security is traded without a specific dividend or distribution."  Compl. ¶ 70; UPC Rule 11120(c); *In re THCR/LP Corp.*, 2006 WL 530148 at *5.  The ex-date can only be set by FINRA and determines which unitholder is ultimately entitled to the distribution.  *In re THCR/LP Corp.*, 2006 WL 530148 at *5. "Taken together, these two dates delimit the timeframe during which a security, when sold, carries with it from the seller to the buyer the right to receive a distribution."  *Id.*; *see* UPC Rule 11140.

The record date determines to whom the issuer *sends* the distribution.  The ex-date determines which unitholder is legally *entitled* to the distribution, as well as the date when the price of the security is adjusted downward to reflect loss of the right to the distribution:

> The record date is the date on which one must be registered as a shareholder on the stock book of a company in order to *receive* a dividend declared by that company. The fact that an individual is the holder of record on the record date, however, does not necessarily mean that such person is

---

[13]  Although strictly speaking only some of these are "FINRA rules," in this Memorandum Opinion the term will be applied to all the above-listed securities rules and regulations.

*entitled* to retain the dividend. ***In terms of entitlement, the ex-dividend date is the dividing line.... When stock is sold prior to the ex-dividend date, the right to a dividend goes with the stock to the purchaser, rather than staying with the seller....*** Generally the ex-dividend date precedes the record date, and the stockholder entitled to the dividend is the individual to whom the dividend is sent.

*In re THCR/LP Corp.*, 2006 WL 530148, at *6 (emphasis added) (quoting *Limbaugh v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 732 F.2d 859, 861 (11th Cir.1984)).  If the record date precedes the ex-date,[14] and the security is sold during the period between the two, the ***seller*** of the security (who held the security on the record date) will receive the full, unadjusted price for the security, as well as the distribution.  The ***purchaser*** of the security – who is the holder on the ex-date – will be legally entitled to the distribution.  Under such circumstances, the seller will be obligated to remit the value of the dividend to the buyer.  *See* NASD Notice to Members 00-54 (August 2000)[15]; *Silco, Inc. v. United States*, 779 F.2d 282, 284 (5th Cir. 1986) (noting in a taxpayer case involving a cash dividend under New York Stock Exchange rules "[w]hen a stock sales contract is executed after the record

---

[14] This occurs when the distribution is 25% or more of the value of the subject security.

[15] Under the subheading "Dividends Or Distributions 25 Percent Or Greater Than Security Value" the NASD Notice states:

> For example, if an issuer has announced August 10 as the record date and August 31 as the payable date, then the ex-date will be September 1, the first business day after the payable date. In this example, September 1 is the day on or after which a buyer would purchase the security without the dividend and, therefore, the day on which the price of the stock is adjusted downward. In this example, ***a seller of the security on August 15, even though the holder of record to receive the dividend, would have to relinquish the dividend to the buyer***. Indeed, because the value of the security on August 15 has not yet been adjusted downward to reflect the dividend distribution, the seller in this example would be unjustly enriched by keeping the dividend. The seller would have received the value of the dividend twice: first, as fully reflected in the unadjusted price of the stock on August 15; and secondly, as subsequently paid by the company to record date holders.

NASD Notice to Members 00-54 (emphasis added).

date in these circumstances, the seller, who is the holder of record on the record date, receives the dividend from the corporation but must remit the dividend to the purchaser. The seller does this by executing a due-bill to the buyer at the time of sale and then transferring funds to satisfy that due-bill.").[16]

The Plan's and the UPC 11140's respective allocations[17] will coincide or differ depending on the size of the distribution. If the distribution is small, that is, less than 25% of the value of the subject security, the allocations will be the same. The Plan allocates all distributions according to the Unitholder Distribution Record Date, which must be "at least 21 days prior to a contemplated Unitholder Distribution," i.e., the "payable date." Plan § 6.2. Under UPC 11140(b)(1), which applies to distributions less than 25% of the value of the subject security, "the date designated as the ex-date shall be the second business day preceding the record date." NASD Notice to Members 00-54

---

[16] *See also Drexel Burnham Lambert, Inc. v. Chapman*, 174 Ga. App. 336, 339 (1985)(noting in a stock dividend case under NASD rules that "[t]he record date establishes only to whom the certificates are sent. The ex-dividend date, when the effect of the issuance . . . is recognized and acknowledged on the market, is the date when ownership of the additional shares is determined."); *Limbaugh v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 732 F.2d 859, 861 (11th Cir. 1984) (affirming the district court holding that Limbaugh, who received the distribution from the issuer because he was the holder on the record date, "was indeed indebted to" broker Merrill Lynch for the distribution because he sold the securities through Merrill Lynch before the ex-date). In other words, even for allocations of large dividends, there is some agreement between the Plan and the FINRA Rules, both allowing the selling shareholder to receive the dividend. The FINRA Rules, however, allocate dividend *entitlement* to the purchasing shareholder, while the Plan does not. Thus, Plaintiffs may be able to seek relief from the Selling Unitholders; this issue is not before the Court, however.

[17] "Allocation" is here used to mean either the sending of the distribution to the unitholder under the Plan, or the designation of entitlement to the distribution under FINRA Rules.

(August 2000).  As the processing of a security sale takes three business days (Compl. ¶ 32), for small distributions the Plan and the UPC will select the same unitholder.[18]

In contrast, if the distribution is large, that is, 25% or greater of the value of the subject security, the respective allocations under the Plan and UPC 11140 will differ.  As the Plan makes no distinction as to size of distribution, its allocation will remain unchanged.  Under UPC 11140(b)(2), which governs large distributions, "the ex-date shall be the first business day following the payable date."  In other words, the Plan requires the record date (which determines the distribution recipient) to occur at least 21 days prior to the payable date, while UPC 11140 requires the ex-date (which determines who is entitled to the distribution) to occur the day after the payable date.

Also in regard to notification requirements, the Plan and the FINRA Rules differ.  The Plan and Orders make no mention of any obligations to notify regulatory authorities, or to otherwise observe any authority beyond the CCAA and the Plan.  Plan § 6.2; Sanction Order ¶ 34.  Indeed, the Sanction Order explicitly leaves adherence to such outside authority to the Monitor's discretion and releases Defendants and the Monitor from liability for disregarding such authority.  Sanction Order ¶¶ 34, 40.  The FINRA Rules, on the other hand, require that the issuer notify FINRA ten days prior to the record

---

[18] For example, if the issuer announces Thursday, December 18, as the record date, all holders as of Monday, December 15, will still be holders on Thursday and thus will be sent the distribution.  Under UPC 11140, the ex-date (i.e., the date on which no dividend will come with the security) will be Tuesday, December 16, two business days prior to the announced record date.  Thus, a buyer of the security on Tuesday, December 16, will not receive a distribution under the Plan (because his ownership will not take effect until Friday, December 19) nor under UPC 11140 (because he purchased the security on the ex-date).  Note that in the above scenario, the "payable date," is largely irrelevant, as long as it falls at least 21 days after the record date under the Plan.

date, and "further advise FINRA of, *inter alia*, the date and amount of the dividend payment, and obtain FINRA's approval." Rule 10b-17; Rule 6490; Compl. ¶ 69.

E.    Discharge and Release Provisions in the Plan and Orders

The Plan and Orders contain provisions that release Defendants from liability for any actions or omissions related to, arising out of, or connected to the Plan (collectively, the "Releases," as referred to in the Introduction, *supra*).    The Plan's release provision provides:

> ***On the Plan Implementation Date*** and in accordance with the sequential steps and transactions set out in Section 8.3 of the Consolidated CCAA Plan, ***the Arctic Glacier Parties***, the Monitor, Alvarez and Marsal Canada Inc. and its affiliates, the CPS, ***the Trustees, the Directors and the Officers, each and every present and former employee*** who filed or could have filed an indemnity claim or a DO&T Indemnity Claim against the Arctic Glacier Parties ***. . . and any Person claiming to be liable derivatively through any or all of the foregoing Persons (the "Releasees") shall be released and discharged*** from any and all demands, claims, actions, causes of action, counterclaims, suits, . . . and other recoveries on account of ***any liability, obligation, demand or cause of action of whatever nature which any Person may be entitled to assert***, . . . whether known or unknown, matured or unmatured, direct, indirect or derivative, foreseen or unforeseen, ***existing or hereafter arising, based in whole or in part on any omission, transaction, duty, responsibility, indebtedness, liability, obligation, dealing or other occurrence*** existing or taking place on or prior to the later of the Plan Implementation Date[19] and the date on which actions are taken to implement the Consolidated CCAA Plan ***that are in any way related to, or arising out of or in connection with the Claims, the Arctic Glacier Parties' business and affairs whenever or however conducted, the Consolidated CCAA Plan, the CCAA Proceedings***, any Claim that has been barred or extinguished pursuant to the Claims Procedure Order or the Claims Officer Order . . . ***and all claims arising out of such actions or omissions shall be forever waived and released . . . all to the full extent permitted by applicable law***,[20] provided that ***nothing in the Consolidated CCAA Plan shall release***

---

[19] January 22, 2015.

[20] The Plan defines "Applicable Law" as:

any law, statute, regulation, code, ordinance, principle of common law or equity, municipal by-law, treaty, or order, domestic or foreign . . . having the force of law,

> *or discharge a Releasee from any obligation created by or existing under the Consolidated CCAA Plan or any related document*.

Plan § 9.1 Consolidated CCAA Plan Releases (emphasis added).  Note that the Plan's release is effective as of the Plan Implementation Date (January 22, 2015[21]), and it does not apply to obligations imposed by the Plan or Orders.

The Sanction Order contains several provisions that release Defendants from liability.  The following provision, for example, sanctions and approves the release in the Plan:

> THIS COURT ORDERS AND DECLARES that the ***Plan*** (including without limitation, the transactions, arrangements, reorganizations, assignments, cancellations, compromises, settlements, extinguishments, discharges, injunctions and ***releases set out therein***) ***is hereby sanctioned and approved pursuant to the CCAA***.

Sanction Order ¶ 9 (emphasis added).  Similarly, paragraph 28 expressly approves all of the Plan's releases:

> THIS COURT ORDERS AND DECLARES that the releases contemplated by the Plan are approved.

Sanction Order ¶ 28.  Paragraph 11 gives effect to any release and discharge in the Plan:

> THIS COURT ORDERS that ***at the Effective Time*** [i.e., 12:01 a.m. on the Plan Implementation Date of January 22, 2015],[22] the Plan and all associated steps, compromises, settlements, injunctions, releases, reorganizations and

---

of any Government Authority having or purporting to have authority over that Person, property, transaction, event or other matter and regarded by such Government Authority as requiring compliance.
Plan § 1.1 Definitions.

[21] Compl. ¶¶ 39, 45 (noting that the "Plan Implementation Date" is January 22, 2015).

[22] Sanction Order ¶ 1.  Definitions ("THIS COURT ORDERS that any capitalized terms not otherwise defined in this Sanction Order shall have the meanings ascribed to them in the Plan."). See also Plan § 1.1 Definitions (defining "Effective Time" and "Plan Implementation Date"); Compl. ¶¶ 39, 45 (noting that the "Plan Implementation Date" is January 22, 2015).

discharges effected thereby shall be, and are hereby deemed to be: (a) implemented, in accordance with the provisions in the Plan.

Sanction Order ¶ 11 (emphasis added).

The following provision in the Sanction Order provides a broad release, but also does not specifically cover the Individual Defendants:

THIS COURT ORDERS that none of the Arctic Glacier Parties, the Monitor and/or the CPS shall incur any liability as a result of acting in accordance with the terms of the Plan or this Sanction Order, *save and except for any gross negligence or wilful misconduct on their parts*.

Sanction Order ¶ 14 (emphasis added).  Another provision provides a broad release applicable to all Defendants.  It specifically approves any steps and actions taken by Defendants that are related to distributions:

THIS COURT ORDERS that the Monitor, the Transfer Agent *and any other Person* required to make any distributions, payments, deliveries or allocations or take any steps or actions related thereto pursuant to the Plan *are hereby authorized and directed to complete such distributions*, payments, deliveries or allocations and to take any such related steps or actions, as the case may be, in accordance with the terms of the Plan, *and such distributions, payments, deliveries and allocations, and the steps and actions related thereto, are hereby approved*.

Sanction Order ¶ 16 (emphasis added).

Paragraph 19 of the Sanction Order deems that each unitholder consented and agreed to all of the provisions of the Plan in their entirety, and if there is any conflict between the Plan and the provisions of any other agreement, the Plan takes precedence and priority:

THIS COURT ORDERS that, *as of the Plan Implementation Date* [i.e., January 22, 2015[23]], each Affected Creditor and Unitholder shall be deemed

---

[23] Compl. ¶¶ 39, 45 (noting that the "Plan Implementation Date" is January 22, 2015).

to have consented and agreed to all of the provisions of the Plan in their entirety, and, in particular, each affected Creditor and Unitholder shall be deemed: (a) to have granted, executed and delivered to the Monitor and the Arctic Glacier Parties all documents, consents, releases, assignments, waivers or agreements, statutory or otherwise, required to implement and carry out the Plan in its entirety; and (b) to have agreed that if there is any conflict between the provisions of the Plan and the provisions, express or implied, of any agreement or other arrangement, written or oral, existing between such Affected Creditor or Unitholder and the Arctic Glacier Parties as of the Plan Implementation Date, the provisions of the plan take precedence and priority, and the provisions of such agreement or other arrangement shall be deemed to be amended accordingly.

Sanction Order ¶ 19 (emphasis added).   The following provision applies to all

"Releas*ees*," which as defined in § 9.1 of the Plan includes all Defendants:

THIS COURT ORDERS that all Persons shall be permanently and forever barred, estopped, stayed and enjoined, *from and after the Effective Time* [i.e., 12:01 a.m. on the Plan Implementation Date of January 22, 2015],[24] in respect of *any and all Releases*, from: (i) commencing, conducting or continuing in any manner, directly or indirectly, *any action, suits, demands or other proceedings of any nature or kind whatsoever* (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) *against the Releasees* . . . (iii) commencing, conducting or continuing in any manner, directly or indirectly, any action, suit or demand, including without limitation by way of contribution or indemnity or other relief, in common law or in equity, for breach of trust or breach of fiduciary duty, under the provisions of any statute or regulation, or other proceedings or any nature or kind whatsoever (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) against any Person who makes such a claim or might reasonably be expected to make such a claim, in any manner or forum, against one or more of the Releases . . . (v) taking any actions to interfere with the implementation or consummation of the Plan; provided, however, that the foregoing shall not apply to the enforcement of any obligations under the Plan.

---

[24] Plan § 1.1 Definitions (defining "Effective Time" and "Plan Implementation Date"); Compl. ¶¶ 39, 45 (noting that the "Plan Implementation Date" is January 22, 2015).

Sanction Order ¶ 29.  Finally, the following provision covers all Defendants in regard to

distributions:

> THIS COURT ORDERS that none of the Monitor, the CPS, the Trustees, the
> Arctic Glacier Parties, or *any individuals related thereto* shall incur any
> liability as a result of *payments and distributions to Unitholders*, in each
> case on behalf of AGIF, once such distribution or payment has been made
> by the Monitor to, and confirmation of receipt has been received by the
> Monitor from, the Transfer Agent.

Sanction Order ¶ 40 (emphasis added).

In its Recognition Order, the Court gave all of the Sanction Order's release

provisions "full force and effect in the United States."   Recognition Order ¶ 2.   The

following release in the Recognition Order is broad, and it applies to all Defendants:

> On the *Plan Implementation Date* [i.e., January 22, 2015[25]] and in
> accordance with the sequential steps and transactions set out in Section 8.3
> of the CCAA Plan, *the Debtors*, the Monitor, Alvarez and Marsal Canada
> Inc. and its affiliates, the CPS, *the Trustees, the Directors and the Officers*,
> each and every present and former employee who filed or could have filed
> an indemnity claim or a DO&T Indemnity Claim against the Debtors, . . .
> and any Person claiming to be liable derivatively through any or all of the
> foregoing Persons *(the "Releasees") shall be released and discharged from
> any and all demands, claims* . . . including for injunctive relief or specific
> performance and compliance orders, expenses, executions and other
> recoveries on account of any liability, obligation, demand or cause of action
> of whatever nature which any Person may be entitled to assert, whether
> statutory or otherwise arising, including any and all claims in respect of the
> payment and receipt of proceeds and statutory liabilities of any of the
> Trustees, *Directors, Officers and employees of the Debtors* and any alleged
> fiduciary or other duty (whether acting as a Trustee, *Director, Officer,
> member or employee or acting in any other capacity in connection with the
> Debtors' business or an individual Debtor*), whether known or unknown,
> matured or unmatured, direct, indirect or derivative, foreseen or
> unforeseen, existing or hereafter arising, based in whole or in part on any
> omission,  transaction,  duty,  responsibility,  indebtedness,  liability,
> obligation, dealing or other occurrence existing or taking place on or prior

---

[25] Compl. ¶¶ 39, 45 (noting that the "Plan Implementation Date" is January 22, 2015).

to the later of the Plan Implementation Date and the date on which actions are taken to implement the CCAA Plan that are in any way related to, arising out of or in connection with the Claims, the Debtors' business and affairs whenever or however conducted, the Plan, the Canadian Proceedings and the Chapter 15 Cases . . . and all claims arising out of such actions or omissions shall be forever waived, discharged and released . . . **_all to the full extent permitted by applicable law_**, provided that nothing in the Plan shall release or discharge a Releasee from any obligation created by or existing under the Plan or any related document.

Recognition Order ¶ 5 (emphasis added). In contrast, the following provision, though broad, does not specifically apply to the Individual Defendants:

Neither the Debtors nor the Monitor shall incur any liability as a result of acting in accordance with the terms of the Plan and this Sanction Recognition Order.

Recognition Order ¶ 9.

F. <u>Plaintiffs Purchase AGIF Units</u>

On November 18, 2014, the Monitor issued a report[26] disclosing an "Estimated Unitholders' Distributed Cash on the Plan Implementation Date" of approximately USD $0.153 per share. Compl. ¶ 30. The report predicted a Plan Implementation Date around January 8, 2015. *Id*. AGIF published legal notices on December 11, 2014, in the *Wall Street Journal*, the *Winnipeg Free Press*, and the *Globe & Mail*, announcing that the Unitholder Distribution Record Date would be December 18, 2014. Ramos Dec., Ex. F (Legal Notice, Arctic Glacier Income Fund Notice of Unitholder Distribution Record Date, *Wall Street Journal*, Dec. 11, 2014, at B6), Ex. G (Legal Notice, Arctic Glacier Income Fund Notice of Unitholder Distribution Record Date, *Winnipeg Free Press*, Dec. 11, 2014, at B4), Ex. H

---

[26] The Monitor issued periodic reports for purposes of public disclosure regarding AGIF. Compl. ¶ 29.

(Legal Notice, Arctic Glacier Income Fund Notice of Unitholder Distribution Record Date, *Globe & Mail*, Dec. 11, 2014, at B3).  Four days later, on December 15, AGIF issued a press release posted to the CSE, announcing that "unitholders of the Fund as of December 18, 2014 will be entitled to receive the initial distribution from the Fund pursuant to the [Plan]," but adding that the distribution amount had not yet been established.  Compl. ¶ 31; December 15, 2014 Press Release.  AGIF posted the press release, as well as a Material Change Report, on SEDAR, the electronic filing system for the disclosure documents of public companies and investment funds across Canada.  Motion ¶ 12, n. 7; Ramos Dec., Ex. J (Material Change Report, Arctic Glacier Income Fund, December 15, 2014 ("Material Change Report").

The Material Change Report explained:

> Arctic Glacier Income Fund (the "Fund") announced on December 11, 2014 that unitholders of the Fund as of December 18, 2014 will be entitled to receive the initial distribution from the Fund pursuant to the Plan of Compromise or Arrangement . . . approved by the unitholders on August 11, 2014 (the "Plan"). The date and value of this distribution will be announced by way of a press release once such information is determined.

Material Change Report.  Due to the three day processing period for securities sales, only purchasers on or before December 15, 2014, would have been registered unitholders as of the December 18 record date.  Compl. ¶ 32.

AGIF did not notify FINRA of its planned dividend or the December 18 record date.  Compl. ¶ 31.  As a result, FINRA did not set an ex-date for AGIF units.  Compl. ¶¶ 33-34.  According to Defendants, the Complaint does not allege that Plaintiffs were unaware of AGIF's public disclosures.  Motion ¶ 5.

Starting on December 16, 2014, Plaintiffs began purchasing AGIF units on the OTC from unitholders ("Selling Unitholders") who had acquired their shares prior to confirmation of the Plan.  Compl. ¶ 50; Reply ¶¶ 18-19.  Plaintiffs continued to purchase units up to and including January 22, 2015.  Compl. ¶¶ 50, 53, 55.

On January 9, 2015, another press release announced that AGIF would implement the Plan as soon as possible.  Motion ¶ 15; Ramos Dec., Ex. K (Press Release, Arctic Glacier Income Fund Provides Update on Plan Implementation, January 9, 2015 ("January 9, 2015 Press Release")).  The January 9, 2015 Press Release stated:

> As previously announced by the Fund on December 15, 2014, the date and value of the initial distribution to unitholders of the Fund, as contemplated in the Plan, will be announced by way of a press release once such information is determined.

January 9, 2015 Press Release.

AGIF issued yet another press release on January 21, 2015, disclosing that the Plan Implementation Date would be the next day, January 22, 2015, and that "unitholders of the Fund as of December 18, 2014 (the 'Record Date') were entitled to receive an initial distribution from the Fund pursuant to the Plan of $0.155570 USD per unit of the Fund held on the Record Date."  Motion ¶ 16; Ramos Dec., Ex. L (Press Release, Arctic Glacier Income Fund Announces Distribution to Unitholders, January 21, 2015 ("January 21, 2015 Press Release")).

On January 22, 2015, AGIF distributed through a transfer agent $0.155570 USD per unit[27] to the unitholders of record as of the December 18, 2014 Unitholder Distribution

---

[27] At this time AGIF units were trading at approximately $0.20 per unit.  Compl. ¶ 40.

Record Date.  Compl. ¶¶ 39-40.  AGIF did not notify FINRA of the January 22 payable date.  Compl. ¶ 39.  Given the three day processing delay, Plaintiffs allege that the de facto and unofficial ex-date for the dividend was December 16, 2014, the day after the last day on which a holder would have had to purchase units in order to receive the dividend. Compl. ¶¶ 32-34, 41-42.  As Plaintiffs began purchasing units on December 16, 2014, they did not receive the dividend.  Compl. ¶¶ 47, 49, 50.

On January 23, 2015, the Investment Industry Regulatory Organization of Canada ("IIROC") imposed a "trading halt" on AGIF units trading on the CSE, listing the reason for the halt as "Pending Company Contact."  Motion ¶ 17; Ramos Dec., Ex. M (IIROC Trading Halt – AG.UN, January 23, 2015).  Minutes after IIROC's halt began, FINRA halted trading of AGIF units on the OTC, citing Halt Code "U1," which refers to "Foreign Markt/Regulatory Halt."  Motion ¶ 17; Ramos Dec., Ex. O (FINRA Over-the-Counter-Equities Trading Halts, January 23, 2015); FINRA, Trading Halts: Halt Code, *available at* http://otce.finra.org/TradeHaltsCurrent.  IIROC and FINRA lifted their respective trading halts on January 28, 2015.  Compl. ¶ 44; Motion ¶ 17; Ramos Dec., Ex. P (IIROC Trade Resumption – AG.UN, January 28, 2015).  In the days following resumption of trading on January 29, 2015, the average unit price decreased by 75%, from a closing price of approximately $0.21 per unit on January 22, 2015, to $0.05 per unit.  Compl. ¶ 45.  The decrease in unit price reflected the loss of the right to a dividend.  Compl. ¶ 45.

G.  Plaintiffs Allege Defendants Decided Not to Take Corrective Action

Plaintiffs allege that Individual Defendant Adams, AGIF's Secretary, admitted to Plaintiff Eldar Brodski Zardinovsky in a telephone conversation on or about March 5,

2015, that "he had observed after the issuance of the [December 15, 2014] Press Release that there was no change in the market price of AGIF units," that the Press Release "should have caused the share price to have fallen by 75% on December 16, 2014, the first day units supposedly began to trade without the right to receive the dividend," and "that despite this awareness that AGIF units were trading at an unjustified several hundred percent premium, Defendants affirmatively decided not to take any corrective action to ensure that current or potential shareholders had the information contained in the Press Release . . . ."  Compl. ¶¶ 77-78.

   H.  Plaintiffs' Claims

Plaintiffs assert that Defendants [1] "may pay dividends only with the approval of [FINRA] . . . and [2] then only to holders of the securities that FINRA recognizes as having a right to receive the dividend in accordance with FINRA's rules."  Compl. ¶ 1. According to Plaintiffs, under UPC 11140(b)(2) they were entitled to the dividend because they held units on the payable date (January 22, 2015), the day before the ex-date.  Compl. ¶ 52.  "[I]nstead of paying Plaintiffs the almost $2 million in dividends they were entitled to receive, [Defendants] paid the dividends to the parties who sold the units of AGIF to Plaintiffs."  Compl. ¶ 1.

Furthermore, Plaintiffs allege that "Defendants violated securities rules and regulations by failing to disclose material information relating to AGIF's decision to pay dividends that caused the price of AGIF units to be wrongfully inflated by approximately 75% . . . resulting in steep losses to Plaintiffs."  Compl. ¶ 2.

In short, Plaintiffs argue that Defendants failed to meet their obligations under FINRA Rules.  As a result, Defendants are allegedly liable for (1) negligence for breaching their duty to Plaintiffs under the FINRA Rules to pay dividends to them; and (2) negligence for breaching their duty to Plaintiffs "to comply with all relevant statutes, rules, regulations, authorities and agreements concerning the establishment of the ex-date in connection with its January 2015 dividend payment."  Compl. ¶¶ 85, 86, 89.  The Individual Defendants are allegedly liable for breach of fiduciary duty owed to Plaintiffs "to ensure that dividend payments intended for unitholders were paid to Plaintiffs" as required by the FINRA Rules.  *See* Compl. ¶ 93.

Defendant AGIF is allegedly liable for negligent misrepresentation for breaching its "duty to disclose material information related to AGIF's January 2015 dividend payment," including (1) that it would disregard the FINRA Rules, (2) that it would "unilaterally establish the ex-date without the review and approval of a regulator or exchange," and (3) "the trading price of AGIF's stock had not appropriately adjusted downward to reflect" AGIF's decision to announce a record date but not an ex-date under the FINRA Rules.  Compl. ¶¶ 97-98; Opp. ¶¶ 96-98.

The Complaint also contains allegations that Defendant AGIF is liable for violation of § 10(b) of the 1934 Act and Rule 10b-5 for failing to disclose material facts regarding its disregard of FINRA Rules, its unilateral and unapproved establishment of the ex-date, and the alleged failure of AGIF stock to appropriately adjust downward after the Unitholder Distribution Record Date had passed.  Compl. ¶¶ 104-107.  Furthermore, the Complaint alleges common law fraud for failure to comply with the FINRA Rules and

for failure to fully disclose the same material information mentioned above in regard to the claims for negligent misrepresentation and violation of § 10(b) and Rule 10b-5. Compl. ¶¶ 98, 114-116. Plaintiffs seek compensatory damages on all counts, reasonable attorneys' fees and costs, prejudgment interest, punitive damages, and treble damages, and a distribution pursuant to the Plan. Compl. ¶ 24.

Plaintiffs maintain that Defendants' obligations under the FINRA Rules constituted "concurrent and additional obligations under U.S. law that did not conflict in any respect with the Plan or Recognition Order." Opp. ¶¶ 51, 56, 61-62. Thus, Plaintiffs say that they are *not* suing for the distributions that the Defendants actually made to the Selling Unitholders, but rather are suing for Defendants' failure to make distributions to the Plaintiffs as well as Defendants' failure to disclose to Plaintiffs material facts regarding AGIF's distribution procedure. Opp. ¶¶ 38, 61. Plaintiffs argue that the Releases apply only to Defendants' distributions to the Selling Unitholders, but do *not* apply to Defendants' failure to meet their "concurrent and additional obligations" to Plaintiffs under the FINRA Rules. Opp. ¶ 61.

## LEGAL STANDARD

Defendants have filed the Motion for failure to state a claim under Fed. R. Civ. P. 12(b)(6), applicable to this adversary proceeding through Fed. R. Bank. P. 7012(b).[28] Under Rule 12(b)(6), the Court must accept as true all material allegations of the

---

[28] Defendants have also moved to dismiss Plaintiffs' misrepresentation claim for lack of standing under Fed. R. Civ. P. 12(b)(1). As the Court is dismissing Plaintiffs' Complaint in its entirety for failure to state a claim under Fed. R. Civ. P. 12(b)(6) and Fed. R. Bank. P. 7012(b), the Court finds it unnecessary to address Defendants' lack of standing defense.

complaint. *Spruill v. Gillis*, 372 F.3d 218, 223 (3d Cir.2004). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1420 (3d Cir.1997) (internal quotation marks omitted). The Court may grant such a motion to dismiss only if, after "accepting all well-pleaded allegations in the complaint as true, and viewing them in the light most favorable to plaintiff, plaintiff is not entitled to relief." *Maio v. Aetna, Inc.*, 221 F.3d 472, 481–82 (3d Cir.2000) (internal quotation marks omitted).

To withstand a motion to dismiss under Rule 12(b)(6), "a civil plaintiff must allege facts that 'raise a right to relief above the speculative level on the assumption that the allegations in the complaint are true (even if doubtful in fact).' " *Victaulic Co. v. Tieman*, 499 F.3d 227, 234 (3d Cir.2007) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). While heightened fact pleading is not required, "enough facts to state a claim to relief that is plausible on its face" must be alleged. *Twombly*, 550 U.S. at 570. A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009); *Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 84 (3d Cir. 2011). The Court is not obligated to accept as true "bald assertions," *Morse v. Lower Merion School Dist.*, 132 F.3d 902, 906 (3d Cir.1997) (internal quotation marks omitted), "unsupported conclusions and unwarranted inferences," *Schuylkill Energy Res., Inc. v. Pennsylvania Power & Light Co.*, 113 F.3d 405, 417 (3d Cir.1997), or allegations that are "self-evidently false," *Nami v. Fauver*, 82 F.3d 63, 69 (3d Cir.1996).

## **DISCUSSION**

Defendants contend that the Releases insulate them from liability.  Moreover, they argue that under the doctrine of *res judicata* they were only obligated to make distributions pursuant to the Plan, not U.S. securities law, and therefore they violated no law when paying dividends.

Plaintiffs bring the following challenges to Defendants' arguments: (1) beyond the obligations of the Plan, the FINRA Rules impose "concurrent and additional obligations" on Defendants that they failed to meet; (2) the Releases apply only to Defendants' distributions to the Selling Shareholders, not the required distributions to Plaintiffs that Defendants failed to make; (3) the distribution procedure Defendants followed and the Releases violate Plaintiffs' rights under the Due Process Clause of the U.S. Constitution; and (4) the Releases are ineffective as to the Individual Defendants.  This Memorandum Opinion will first discuss the Plan's preclusive effect under *res judicata*; it will then address each of Plaintiffs' challenges, as well as the applicability of the Releases to Plaintiffs' fraud claims.

### *A.  Res Judicata*

A confirmed plan[29] is "*res judicata* as to all issues decided or which could have been decided at the hearing on confirmation."  *In re Szostek*, 886 F.2d 1405, 1408, 1413 (3d Cir. 1989).  Under the doctrine of *res judicata*, a Plan supersedes all applicable law, whether bankruptcy or non-bankruptcy law.  *In re Bowen*, 174 B.R. 840, 847 (Bankr. S.D. Ga. 1994)

---

[29] The Sanction Order approved and sanctioned the Plan.  Sanction Order at 1.

("challenges to a confirmed plan of reorganization which allege that the plan is contrary to applicable law, either bankruptcy or otherwise, are bound to be unsuccessful"). "Under section 1144 of the Bankruptcy Code, orders confirming a plan of reorganization can only be revoked *if the order was procured by fraud*. . . . " *Id.* (emphasis added). "Subject to compliance with the requirements of due process under the Fifth Amendment, a confirmed plan of reorganization is binding upon every entity that holds a claim or interest . . . ." *Id.* at 844 (quoting 5 L. King, Collier on Bankruptcy, ¶ 1141.01, 1141-4 – 1141-9 (15th ed. 1993)).

Here, the Plan's distribution procedure is an adjudication, and to the extent that there is a conflict between that adjudication and the FINRA Rules, the Plan will supersede.[30] *In re Bowen*, 174 B.R. 840, 845 (Bankr. S.D. Ga. 1994). In other words, when faced with conflicting obligations under the Plan and the FINRA Rules, Defendants must follow the former, notwithstanding the latter. *Karathansis v. THCR/LP Corp.*, No. CIV. 06-1591(RMB), 2007 WL 1234975, at *6, *8 (D.N.J. Apr. 25, 2007), *aff'd sub nom. In re THCR/LP Corp.*, 298 F. App'x 120 (3d Cir. 2008) ("[T]he Debtor was obliged to instruct its disbursing agent to make distributions according to the terms of the Plan . . . Appellants are . . . entitled to the Plan distributions . . . notwithstanding UPC Rule 11140").

---

[30] Note that during the period between the CCAA Court's confirmation of the Plan (via the Sanction Order on September 5, 2014) and the Plan Implementation Date (January 22, 2015, the date the Plan took effect), the provisions of the Plan, including § 6.2 regarding distributions, governed Debtors' conduct through the Sanction Order and Recognition Order. See Sanction Order ¶ 12; Recognition Order at 2.

### B.   "Concurrent and Additional Obligations" Under the FINRA Rules

Plaintiffs contend that "[n]othing in the Plan precluded compliance with FINRA rules."  Opp. ¶ 5.  The Plan "established a general procedure for paying dividends, but omitted details that only could be set by regulators, including the date on which an investor had to own AGIF units to have the right to receive the dividend, and the dividend payment date and amount." Opp. ¶ 10.  Plaintiffs maintain that "[t]he Plan does not require payment of the dividend without FINRA approval or in violation of FINRA rules.  Defendants easily could have sought FINRA approval and paid the dividend in compliance with FINRA rules."  Opp. ¶ 56.  "By way of example only, Defendants could have set the payment in a way that would have ensured compliance with FINRA rules and the Plan, in which event [Plaintiffs] would have avoided suffering any damages." Opp. ¶ 56 n. 7.

### 1.   Plaintiffs' Tranches Proposal

Plaintiffs argue that nothing in the Plan says that Defendants had to make a dividend payment which was 25% or greater of the value of the subject security.  4/19/16 Hr. (Gordon).  According to Plaintiffs, a dividend payment of 24% of the value of the subject security would have invoked UPC 11140(b)(1), rather than UPC 11140(b)(2).  *Id.* Subsection (b)(1) requires that "the date designated as the 'ex-dividend date' shall be the second business day preceding the record date if the record date falls on a business day, or the third business day preceding the record date if the record date falls on a day designated by the Committee as a non-delivery date."  UPC 11140(b)(1).

The procedure Defendants followed when announcing and distributing dividends in December 2014 - January 2015 was consistent with UPC 11140(b)(1).  On Monday, December 15, 2014, Defendants announced that Thursday, December 18, 2014, would be the Unitholder Distribution Record Date.  Given that the OTC sale process takes three days,[31] the de facto ex-date thus became Tuesday, December 16, 2014, i.e., this was the date as of which a new security holder would not be entitled to the dividend.  Compl. ¶¶ 32-34, 41-42.  UPC 11140 (b)(1) also selects December 16 as the ex-date because it is exactly two days before the December 18 Unitholder Distribution Record Date.

As the actual dividend distribution occurred on January 22, 2015, the procedure followed by AGIF was also consistent with the Plan, which requires that ". . . the Transfer Agent shall distribute each Unitholder Distribution . . . to each Registered Unitholder, as of the applicable Unitholder Distribution Record Date," which "means the date(s) . . . that are . . . at least 21 days prior to a contemplated Unitholder Distribution . . . "  Plan §§ 1.1 Definitions, 6.2 Distributions from the Unitholders' Distribution Cash Pool.  Thus, there is no conflict between UPC 11140(b)(1) and the Plan; both allocate the distribution to the same Unitholders.

In contrast, if the dividend is 25% or greater of the value of the subject security, UPC 11140(b)(2) applies, requiring that "the ex-dividend date shall be the first business day following the payable date."  UPC 11140(b)(2).  Thus, for such large dividends the FINRA Rules conflict with the Plan's procedure.  Subsection (b)(2) would have required

---

[31] Compl. ¶ 32.

the ex-date to be January 23, 2015, the day *after* the payable date of January 22, 2015.  As noted, the Plan specified that the Unitholder Distribution Record Date, and thus the dividing line between recipients and non-recipients of the distribution, occur at least 21 days *before* the payable date.

Defendants' dividend amounted to approximately 75% of the value of the subject security.  Plaintiffs suggest that Defendants could have accomplished the distribution of this dividend by paying it out in "tranches," for example, each tranche amounting to 24%, 24%, 24% and 3% of the value of the subject security.  4/19/16 Hr. (Gordon).  Doing so would have complied with both the Plan and UPC 11140 (b)(1), the applicable subsection for smaller dividends.

The Court, however, finds Plaintiffs' suggestion unacceptable because it places a limitation on the Plan's dividend procedure.  The Plan makes no distinction between small and large dividends.  Its procedure is clearly intended to apply to any dividend, of whatever size.

Moreover, the Plan is comprehensive as to dividend payments.  In section 8.3 and in Schedule "B" the Plan provides a sequence of steps that must begin on the Plan Implementation Date.  Nowhere in this sequence is there room for any distribution other than the one presented in section 6.2, which only provides for distributions "to each Registered Unitholder, as of the applicable Unitholder Distribution Record Date[32] . . . ."  Plan § 6.2.  Pursuant to the Sanction Order, the Monitor is only obligated to follow the

---

[32] As noted above, the Plan requires that the Unitholder Distribution Record Date be at least 21 days before the payable date.

CCAA, the Plan and Orders.  Sanction Order ¶ 34 (the Monitor or CPS "shall be exclusively authorized and empowered to [make distributions], to the exclusion of all other Persons including the Artic Glacier Parties, and without interference from any other Person").  Where the Plan imposes applicable law requirements, it does so explicitly.  Plan §§ 6.10(a), 6.10(b), 6.11, 6.13.  The Plan does not mention applicable law requirements in section 6.2.  Plan § 6.2.  Finally, the Plan's release provision, section 9.1, shields Defendants from liability for "any omission, transaction, duty, responsibility, indebtedness, liability, obligation," but includes an exception: "provided that nothing in the Consolidated CCAA Plan shall release or discharge a Releasee from any obligation created by or existing under the Consolidated CCAA Plan or any related document." Plan § 9.1 Consolidated CCAA Plan Releases.  In other words, the Plan subjects Defendants to *its* obligations, while releasing them from all other obligations.

To impose on the Plan FINRA's distinction between small and large dividends is to conclude that the Plan is not comprehensive as to its distribution procedure, even though it indicates that it is.  To do so would limit the Monitor's discretion in making distributions, contrary to the Sanction Order's prohibition of such limitations.  Therefore, the Court concludes that Plaintiffs' tranches proposal does not offer a way to harmonize the Plan and the FINRA Rules.[33]

---

[33] The same analysis, with the same result, can be applied to the other area of conflict between the Plan and the FINRA Rules: the requirement under the FINRA Rules that the issuer must, among other things, notify FINRA of the planned dividend payment ten days before the record date, and obtain FINRA's approval.

2. <u>Plaintiffs' Proposal that Defendants Pay Twice</u>

Plaintiffs make yet another proposal for eliminating conflict between the Plan and the FINRA Rules. They maintain that Defendants could have paid dividends under both the Plan and the FINRA Rules, even if in doing so Defendants would pay some dividends twice, once to the Selling Unitholders and once to Plaintiffs. Opp. ¶¶ 57-60. Plaintiffs maintain that this is the solution used by the court in *Karathansis*, 2007 WL 1234975.

In *Karathansis* the District Court reviewed the Bankruptcy Court's holding that the FINRA Rules[34] trumped the reorganization plan and therefore the dividend should go to the purchasing shareholders. *Karathansis*, 2007 WL 1234975, at *1. The District Court overturned the Bankruptcy Court in part, holding that (1) the FINRA Rules did not supersede the plan, and (2) the plan allocated the dividend to the selling shareholders and thus the selling shareholders should be paid the dividend. *Id*. at *9.

The holding did not say that the debtor was obligated to follow the FINRA Rules. Rather, it said that the plan and the FINRA Rules could be harmonized if two conditions were present: (1) the selling shareholders receive a "double dip" payment (i.e., receive the value of the distribution twice) *and* (2) the debtor pays twice. *Id*. at *8-9. Both these conditions presented issues that the court explicitly did not address: (1) the possible unjust enrichment of the selling shareholders (this issue was remanded to the Bankruptcy Court for further proceedings), and (2) "the Debtor *may* have to pay twice," an issue that "is not presently before it." *Id*. at *9 (emphasis added). The District Court did *not* hold

---

[34] The same FINRA Rules were at issue in *Karathansis* as in the instant case.

that the debtor should have paid twice; rather, it recognized that the debtor *may* have to pay twice because it had already paid the purchasing shareholders under the Bankruptcy Court's erroneous ruling, and now had to pay the selling shareholders under the District Court's holding.

In the instant case, paying twice would violate the Plan and Orders. In breach of the Sanction Order, it would impose an obligation on the Monitor that the Monitor did not choose. *See* Sanction Order ¶ 34. It would constitute an additional step in the Plan's distribution procedure, something the Plan does not allow. *See* Plan § 8.3 and Schedule "B." Therefore, Plaintiffs' proposal that Defendants pay twice fails as a method of harmonizing the Plan and the FINRA Rules.

Rather than "concurrent and additional obligations, the Court finds that Defendants have conflicting obligations under the Plan and the FINRA Rules. Thus, absent the Plan being procured by fraud, or Plaintiffs establishing a Due Process violation,[35] the doctrine of *res judicata* will bar Plaintiffs from now contesting the Plan's distribution procedure, even if only to argue that the procedure omits important steps that Defendants should have been required to take. *See* Compl. ¶ 28. Defendants were obligated to follow the Plan's distribution procedure and eschew any conflicting procedure, such as that provided in the FINRA Rules. Therefore, Plaintiffs have failed adequately to allege that Defendants were obligated to follow the FINRA Rules and that Defendants are liable for Plaintiffs' losses.

---

[35] *See In re Bowen*, 174 B.R. at 844, 848.

Although the preclusive effect of *res judicata* in regard to the Plan's distribution procedure is a sufficient ground for the Court to grant the Motion, the Releases provide a second ground.

C.  Applicability of Releases to Defendants' Omission of Payments to Plaintiffs

Plaintiffs apply their "concurrent and additional obligations" argument to Defendants' Releases defense.  Compl. ¶ 51.  Plaintiffs assert that the release in paragraph 9 of the Recognition Order, which states that AGIF shall not "incur any liability as a result of acting in accordance with the terms of the Plan and this Sanction Recognition Order," is inapplicable to their claims because,

> [Plaintiffs] do not seek to hold Defendants liable because of any acts *in accordance with* the Plan and Recognition Order.  Rather . . . liability is predicated on Defendants' disregard of its concurrent and additional obligations under U.S. law that did not conflict in any respect with the Plan or Recognition Order.

Opp. ¶ 51 (emphasis in original).  Leaving aside that Plaintiffs' "concurrent and additional obligations" argument is unpersuasive (*see supra*), Plaintiffs get little mileage from the argument in the context of the Releases.  The Releases are sufficiently broad to cover Plaintiffs' claims.

The Releases took effect on the Plan Implementation Date of January 22, 2015.  Plan § 9.1; Sanction Order ¶¶ 11, 19, 29; Recognition Order ¶ 5.  By their terms, the Releases cover the period during which the alleged acts of misconduct occurred (December 2014 and January 2015 up to and including January 22, 2015, when Defendants made the distribution in question).

Furthermore, the Releases prohibit all claims against Defendants "***in any way related to, or arising out of or in connection with*** the Claims, the Arctic Glacier Parties' business and affairs whenever or however conducted, the Consolidated CCAA Plan, the CCAA Proceedings . . . ."  Plan § 9.1 (emphasis added); *see also* Recognition Order ¶ 5; Sanction Order ¶ 40 ("THIS COURT ORDERS that none of the Monitor, the CPS, the Trustees, the Arctic Glacier Parties, or any individual related thereto shall incur any liability as a result of payments and distributions to Unitholders . . .").  In a bankruptcy release, the phrase "in relation to" is expansive.  *Travelers Indem. Co. v. Bailey*, 557 U.S. 137, 138 (2009).   Here, Plaintiffs' claims are predicated on not having received distributions.  The claims clearly relate to, arise out of, or are in connection with the Plan's distribution procedure, whether the procedure as implemented involved actions taken for the benefit of the Selling Unitholders, or omissions of actions that would have benefited Plaintiffs.  *See* Plan § 9.1 (stating "claims arising out of such actions or ***omissions*** shall be forever waived and released" (emphasis added)).

   D.  Plaintiffs' Due Process Rights

Plaintiffs maintain that the Releases extend only "to the full extent permitted by applicable law . . ."  Plan § 9.1 Consolidated CCAA Plan Releases; *see also* Recognition Order ¶ 5.  The Plan and Recognition Order include the phrase "to the full extent permitted by applicable law" because there are limits to the types of claims from which Defendants can be shielded by a release.  For example, a Release will be ineffective if Plaintiffs' Due Process rights were violated in the confirmation of the Plan. *In re Bowen*,

174 B.R. at 844.  The only relevant law that Plaintiffs proffer as being beyond the reach of the Releases is the Due Process Clause of the U.S. Constitution. [36]  Opp. ¶ 45.

Plaintiffs allege that "pursuant to the Due Process Clause . . . releases and/or discharges of claims in bankruptcy are unenforceable where, as here, the claim arose after the date of the discharge or release and the plaintiffs' interests were not represented in the underlying bankruptcy proceeding."  Opp. ¶ 41.  Plaintiffs argue that despite the Plan Implementation Date of January 22, 2015, the true discharge or release date occurred when the Plan and Orders were signed in August and September 2014, several months before a connection arose between Plaintiffs and Defendants.  Opp. ¶ 44.  Thus, the Releases cannot insulate Defendants from liability for any conduct occurring after the signing dates of the Plan and Orders.  Opp. ¶¶ 40, 42, 44.

In support, Plaintiffs cite *Jones v. Chemetron Corp.*, where "a plaintiff who was not yet born as of the date of a discharge in bankruptcy asserted personal injury claims based on his mother's exposure to toxic chemicals."  212 F.3d 199 (3d Cir. 2000); Opp. ¶ 48.  The Third Circuit held that the plaintiff could pursue his personal injury claims because:

> [he] had no notice of or participation in the Chemetron reorganization plan. No effort was made during the course of the bankruptcy proceeding to have a representative appointed to receive notice for and represent the interests of future claimants. Therefore, whatever claim [plaintiff] Ivan Schaffer may now have was not subject to the bankruptcy court's bar date order and was not discharged by that court's confirmation order.

*Chemetron*, 212 F.3d at 210 (citation omitted); Opp. ¶ 48.

---

[36] Plaintiffs' Due Process argument also applies to the preclusive effect of *res judicata* in regard to the Plan's distribution procedure, discussed *supra.*

*Chemetron* is distinguishable from the instant case. Unlike the *Chemetron* plaintiff, who was not yet born at the time of the bankruptcy discharge, Plaintiffs here purchased units from the Selling Unitholders, who were either themselves appropriately noticed of the Plan and the release it contained, or were the "successors and assigns" of unitholders who participated in the bankruptcy proceeding. Reply ¶¶ 18, 19.[37] The Plan was binding not only on the voting unitholders but also on their "successors and assigns." Plan § 1.3. "An assignee stands in the shoes of the assignor and subject to all equities against the assignor." *Goldie v. Cox*, 130 F.2d 695, 720 (8th Cir. 1942) (citations omitted); *see also In re NationsRent, Inc.*, 381 B.R. 83, 95 (Bankr. D. Del. 2008) ("It is black-letter law that as assignee of Lenders' rights, the Assigned Claimant, became a general, non-priority, unsecured claimant and nothing more . . . . [and] is not entitled to more than the rights Lenders had to assign.")

In sustaining the trustee's claim objection, the Bankruptcy Court in *In re KB Toys, Inc.* held that "a claim in the hands of a transferee has the same rights and disabilities as

---

[37] Debtors' creditors and unitholders accepted the Plan, with over 65% of unitholders participating in the vote, and 99.81% of the voting unitholders approving the Plan. Ramos Dec., Ex. C (Monitor's Certificate (Re. Plan Implementation Date), *In re Arctic Glacier International In., et al.*, No. CI 12-01-76323 (Can. M.Q.B. Jan. 22, 2015)), Ex. D (Seventeenth Report of the Monitor Alvarez & Marsal Canada Inc., *In re Arctic Glacier International Inc., et al.*, No. CI 12-01-76323 (Can. M.Q.B. Aug. 26, 2014) §§ 4.19-.20, Appx. H).

The CCAA Court ordered and declared that "there has been good and sufficient service and delivery of the Meeting Order [regarding approval and sanctioning of the Plan] and the documents referred to in the Meeting Order, including the Notice to Affected Creditors and Notice to Unitholders." Sanction Order ¶ 3. Moreover, each unitholder was "deemed to have consented and agreed to all of the provisions of the Plan in their entirety." Sanction Order ¶ 19; *see also* Plan § 11.1(e)("each Unitholder will be deemed to have consented and agreed to all of the provisions of the Consolidated CCAA Plan, in its entirety . . .").

Finally, the Complaint does not allege that the Selling Unitholders were without notice.

the claim had in the hands of the original claimant."  470 B.R. 331, 343 (Bankr. D. Del.

2012), *aff'd sub nom. In re KB Toys Inc.*, 736 F.3d 247 (3d Cir. 2013).  The court explained:

> I conclude that a trade claim purchaser holds that claim subject to the same rights
> and disabilities under Bankruptcy Code § 502(d) as does the original trade
> claimant . . . . . [since a] purchaser of claims in a bankruptcy is well aware (or
> should be aware) that it is entering an arena in which claims are allowed and
> disallowed in accordance with the provisions of the Bankruptcy Code and the
> decisional law interpreting those provisions.  Under such conditions, a claims
> purchaser is not entitled to the protections of a good faith purchaser.

*Id*.  Here, Plaintiffs were well aware (or should have been aware) that they were entering

a risky investment arena with lower disclosure requirements.  Plaintiffs purchased their

units on the OTC "Pink" market, the website of which includes the following description

and warning:

> With no minimum financial standards, this market includes foreign companies
> that limit distribution of their disclosure to their home market, penny stocks and
> shells, as well as distressed, delinquent, and dark companies not able or willing to
> provide adequate information to investors. Pink requires the least in terms of
> company disclosure and the most in terms of investor research and caution.

Available at http://www.otcmarkets.com/marketplaces/otc-pink (emphasis added);

Motion ¶ 87.  Thus, Plaintiffs have the same rights and disabilities as their predecessor

unitholders.  As the predecessor unitholders had notice of the Plan and Orders when they

were signed, Plaintiffs had sufficient notice and thus their Due Process challenge

premised on *Chemetron* fails.[38]

---

[38] Plaintiffs also cite *Morgan Olson L.L.C. v. Frederico*, 467 B.R. 694 (S.D.N.Y. 2012) and *In re Chance Indus.*, 367 B.R. 689 (Bankr. D. Kan. 2006) in support of the same argument for which they cite *Chemetron*.  In *Morgan*, plaintiff Frederico drove a FedEx truck that had been manufactured by debtor.  The truck ran into a telephone pole, Frederico was injured, and she sued on the grounds of product liability.  Frederico's injury occurred after plan confirmation, and she had no relationship with the debtor at or before the confirmation.  *Morgan* differs from the instant case because (1) here Defendants followed the Plan and thus violated no law (*see* discussion *supra*),

For the same reasons that *Chemetron* is distinguishable, it is irrelevant that the Plan and Orders were signed in August and September 2014, several months before the Plan Implementation Date of January 22, 2015.  Section 9.1 of the Plan releases claims "taking place on or prior to the later of the Plan Implementation Date and the date on which actions are taken to implement the Consolidated CCAA Plan that are in any way related to, or arising out of or in connection with the Claims . . . ."  Plan § 9.1 (barring all claims "whether known or unknown . . . foreseen or unforeseen, existing or hereafter arising"); *see also* Recognition Order ¶ 5.  Defendants' alleged misconduct occurred on or prior to the Plan Implementation Date of January 22, 2015.  The Releases expressly cover conduct during the period prior to and including the Plan Implementation Date.  Plan § 9.1; Sanction Order ¶¶ 11, 19, 29; Recognition Order ¶ 5.  As the predecessor unitholders received notice of the Releases at the time the Plan and Orders were signed, the Releases are effective as to Plaintiffs' claims.

E.  Applicability of Releases to Individual Defendants

Referring to paragraph 9 of the Recognition Order, Plaintiffs assert that "the part of the Recognition Order in question provides no protection to the [I]ndividual Defendants."  Opp. ¶ 51.  The other release provision of the Recognition Order, however, does apply to the Individual Defendants:

---

and (2) Plaintiffs' predecessor unitholders were present during confirmation of the Plan, and thus, as successors and assigns, Plaintiffs had a relationship with Debtors at or before the time the Plan was confirmed.  *Chance* is distinguishable from the instant case for the same reasons as *Morgan*: the plaintiff had no relationship with the debtor at or before the time the plan was confirmed.

> On the Plan Implementation Date . . . the Debtors, . . . the Trustees, the Directors and the Officers . . . (the "Releasees") shall be released and discharged from any and all demands, claims . . . .

Recognition Order ¶ 5.  Similarly, the Releases in the Plan and Sanction Order, given full force and effect by the Recognition Order, also apply to the Individual Defendants.  *See, e.g.*, Plan § 9.1; Sanction Order ¶¶ 9, 16, 29, 40.  Therefore, the Court finds that Plaintiffs' challenge to the Releases as regards the Individual Defendants is unpersuasive.

F.  <u>Applicability of Releases to Fraud Claims</u>

"[O]rders confirming a plan of reorganization can only be revoked if the order was procured by fraud."  *In re Bowen*, 174 B.R. at 848, citing section 1144 of the  Bankruptcy Code.  Furthermore, the Sanction Order explicitly excepts "gross negligence or wilful misconduct" from the scope of its release regarding "the Arctic Glacier Parties, the Monitor and/or the CPS . . . acting in accordance with the terms of the Plan or this Sanction Order. . ."  Sanction Order ¶ 14.  Plaintiffs allege causes of action premised on fraud: violations of Section 10(b) of the 1934 Act and Rule 10b-5, as well as common law fraud.  Compl. ¶¶ 103-123.

Plaintiffs' fraud claims will not survive the Motion for two reasons.  First, the Complaint does not allege that the Plan and Orders were procured by fraud.  Second, Plaintiffs bring their fraud claims on the theory that Defendants failed to meet their "concurrent and additional obligations" under the FINRA Rules.  As explained above, however, Defendants had no "concurrent and additional obligations" under the FINRA Rules.  In regard to making distributions, they only had obligations under the Plan, and

they fulfilled those obligations.[39]   Thus, Defendants did not commit fraud when making

distributions in accordance with the Plan.   The exception in the Sanction Order's release

for "gross negligence and wilful misconduct" is therefore inapplicable.   The Releases

remain effective in the face of Plaintiffs' fraud claims.

### CONCLUSION

For the foregoing reasons, the Court grants Defendants' Motion to Dismiss in its

entirety.

Dated:  July 1, 2016

_____

KEVIN GROSS, U.S.B.J.

---

[39] *See* Second Declaration of Marcos A. Ramos, Esq. in Support of Defendants' Motion to Dismiss the Complaint (D.I. 31), Ex. 2 (Twenty-third Report of the Monitor Alvarez & Marsal Canada Inc., *In re Arctic Glacier International Inc., et al.*, No. CI 12-01-76323 (Can. M.Q.B. Nov. 9, 2015) ¶ 1.10).
.